# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-90338 (CML)** |
| | § | |
| **AXIP ENERGY SERVICES, LP,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

## CERTIFICATE OF NO OBJECTION
[Relates to Docket Nos. 269 and 290]

Pursuant to the *Procedures for Complex Cases in the Southern District of Texas* (the "***Complex Case Procedures***"), the undersigned counsel for the above-captioned debtors (collectively, the "***Debtors***") certifies as follows to the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Court***"):

1. On April 7, 2026, Debtors filed the *Debtors' Notice of Sale of Certain Intellectual Property Assets* [Docket No. 269] (the "***IP Sale Notice***").

2. The deadline for parties to file objections to the IP Sale Notice and the IP Sale Transaction, as that term is defined therein, was April 10, 2026 at 5:00 p.m. (prevailing Central Time) (the "***IP Sale Objection Deadline***"). The IP Sale Objection Deadline has passed.

3. On April 8, 2026, Debtors filed the *Debtors' Notice of Sale of Castex Compressor* [Docket No. 290] (the "***Castex Sale Notice***" and, together with the IP Sale Notice, the "***Notices***").

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are: Axip Energy Services, LP (9220); Axip Energy Services Management, LLC (9986); Axip Holdings, LLC (6302); Axip Leasing Company, LLC (5678); Axip Producer Services - Marcellus I, LLC (3312); Axip Producer Services, LLC (4792); and E3 Compression Holdings LLC (0825). The location of the Debtors' corporate headquarters is: 1221 McKinney, Suite 3175, Houston, Texas 77010.

4927-7019-5873

4. The deadline for parties to file objections to the Castex Sale Notice and the Castex Sale, as that term is defined therein, was April 13, 2026 at 5:00 p.m. (prevailing Central Time) (the "*Castex Sale Objection Deadline*"). The Castex Sale Objection Deadline has passed.

5. In accordance with paragraph 44 of the Complex Case Procedures, the undersigned represents to the Court that counsel has reviewed the Court's docket, and no objections or other responses to either of the Notices appear on the Court's docket, and the Debtors are unaware of any other objection to the Notices.

6. Attached hereto as **Exhibit A** is a proposed order approving the IP Sale Transaction (the "*IP Sale Order*"), which is unmodified from the proposed order attached to the IP Sale Notice.

7. Attached hereto as **Exhibit B** is a proposed order approving the Castex Sale (the "*Castex Sale Order*" and, together with the IP Sale Order, the "*Orders*"), which is unmodified from the proposed order attached to the Castex Sale Notice.

8. The Debtors respectfully request that the Court enter the Orders attached hereto as **Exhibits A** and **B**.

[*Remainder of page intentionally left blank.*]

4927-7019-5873

Dated: April 14, 2026
Houston, Texas

/s/  Paul E. Heath
**VINSON & ELKINS LLP**
Paul E. Heath (TX 09355050)
Matthew J. Pyeatt (TX 24086609)
Trevor G. Spears (TX 24106681)
845 Texas Avenue, Suite 4700
Houston, Texas 77002
Tel: 713.758.2222
Fax: 713.758.2346
Email: pheath@velaw.com
        mpyeatt@velaw.com
        tspears@velaw.com

-and-

David S. Meyer (admitted *pro hac vice*)
Jessica C. Peet (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036
Tel:  212.237.0000
Fax:  212.237.0100
Email: dmeyer@velaw.com
        jpeet@velaw.com

***Counsel to the Debtors and Debtors in Possession***

4927-7019-5873

## CERTIFICATE OF SERVICE

I certify that on April 14, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 */s/ Matthew J. Pyeatt*
Matthew J. Pyeatt

4927-7019-5873

**Exhibit A**

**Proposed IP Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-90338 (CML)** |
| | § | |
| **AXIP ENERGY SERVICES, LP, *et al.*,** | § | **(Chapter 11)** |
| | § | |
| **Debtors.[1]** | § | **(Jointly Administered)** |
| | § | |

**ORDER (I) APPROVING
SALE OF CERTAIN ACQUIRED
ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES AND
(B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND  (II) GRANTING RELATED RELIEF**

Upon the *Emergency Motion of Debtors for Entry of Orders (A) Approving (I) Bidding Procedures, (II) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (III) Assumption and Assignment Procedures; (B) Designating Stalking Horse Bidder and Authorizing Debtors to Provide Bid Protections; (C) Scheduling Auction, Sale Hearing, and Related Deadlines; (D) Approving (I) Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (II) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (E) Granting Related Relief* [Docket No. 20] (the "***Motion***"),[2] filed by the above-referenced debtors and debtors in possession (collectively, the "***Debtors***") seeking, among other things, entry of an order (the "***Sale Order***") (a) authorizing the sale of the Acquired Assets (as defined in the Purchase Agreement) to E4 Energy Services, LLC, a Texas limited liability company (the "***Purchaser***") pursuant to that certain *Asset Purchase*

---

[1]   The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are:  Axip Energy Services, LP (9220); Axip Energy Services Management, LLC (9986); Axip Holdings, LLC (6302); Axip Leasing Company, LLC (5678); Axip Producer Services - Marcellus I, LLC (3312); Axip Producer Services, LLC (4792); and E3 Compression Holdings LLC (0825). The location of the Debtors' corporate headquarters is: 1221 McKinney, Suite 3175, Houston, Texas 77010.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Purchase Agreement (as defined herein), as applicable.

4936-8444-2269

*Agreement*, by and between the Purchaser, Debtor E3 Compression Holdings LLC, Debtor Axip Energy Services, LP, and other signatories thereto (collectively, the "***Sellers***" and each a "***Seller***"), substantially in the form attached hereto as **Exhibit 1** (the "***Purchase Agreement***", and the transactions contemplated therein, the "***Sale Transaction***") free and clear of all Encumbrances (as defined herein) (other than Assumed Liabilities and Permitted Encumbrances); (b) authorizing the assumption and assignment of certain Assigned Contracts (as defined in the Purchase Agreement); and (c) granting related relief, all as more fully set forth in the Motion; and upon consideration of the *Declaration of Robert A. Pacha in Support of the Debtors' (I) Emergency Motion to Obtain Debtor-In-Possession Financing and (II) Motion to Approve Bidding Procedures and Sale* [Docket No. 18] (the "***Pacha Declaration***"), as supplemented by the *Declaration of Robert A. Pacha in Support of Sale* (the "***Supplemental Pacha Declaration***") [Docket No. 260] (the "***Declaration***"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, dated May 24, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having entered the *Order (A) Approving (I) Bidding Procedures, (II) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (III) Assumption and Assignment Procedures; (B) Designating Stalking Horse Bidder and Authorizing Debtors to Provide Bid Protections; (C) Scheduling Auction, Sale Hearing, and Related Deadlines; (D) Approving (I) Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (II) Assumption and Assignment of Executory Contracts and*

4936-8444-2269

*Unexpired Leases; and (E) Granting Related Relief* [Docket No. 135] (the "***Bidding Procedures Order***"), approving, among other things, the Bidding Procedures for the Assets; and the Court having conducted a hearing on April 6, 2026 (the "***Sale Hearing***") to consider the relief requested in the Motion as set forth in this Sale Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction, the Purchase Agreement, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and the Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary, it is HEREBY FOUND AND DETERMINED THAT:

A. **Findings and Conclusions**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction**. The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Acquired Assets pursuant to 28 U.S.C. § 1334(e), as the Acquired Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to

4936-8444-2269

grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b); this Court has the authority to enter a Final Order.

C.     **Venue**. Venue of these Chapter 11 Cases and approval of the Motion and the Sale Transaction is proper in this district and under 28 U.S.C. §§ 1408 and 1409.

D.     **Basis for Relief**. The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9006, 9007, 9008, 9014, and 9019 of the Bankruptcy Rules, rules 4002-1(e) and 9013-1 of the Local Rules, and the Complex Case Procedures. The consummation of the transactions contemplated by the Purchase Agreement and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures and the Debtors and the Purchaser have complied with all of the applicable requirements of such sections and rules with respect to such transactions.

E.     **Final Order; Immediate Effect**. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, and notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and authorizes the closing of all transactions contemplated hereby, including, without limitation, the Sale Transaction without regard to any stay or delay in its implementation.

F.     **Incorporation by Reference**. Findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

4936-8444-2269

G.      **Notice and Opportunity to Object**. Notice of the Motion, the executory contracts and unexpired leases to be assumed and assigned in connection with the Sale Transaction, the Sale Hearing, and the deadlines related thereto was provided to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Agent, the Prepetition Superpriority Agent, and the Prepetition ABL Agent; (c) counsel to the Prepetition 2L Agent; (d) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (e) counsel to the Committee; (f) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (g) the Internal Revenue Service; (h) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (i) all entities known to have asserted a lien or security interest against any of the Acquired Assets; and (j) all counterparties to the executory contracts and unexpired leases to be assumed and assigned in connection with the Sale Transaction.

H.      The Debtors served notice substantially in the form of the *Notice of Sale, Bidding Procedures, Auction, and Sale Hearing* attached to the Bidding Procedures Order as Exhibit 2 (the "*Sale Notice*") on all parties required to receive such notice under the Bidding Procedures Order and applicable rules. *See Certificate of Service* [Docket No. 173]. The Debtors published such Sale Notice in the *Wall Street Journal*. *See Affidavit Re: Publication of Notice of Sale, Bidding Procedures, Auction and Sale Hearing* [Docket No. 143]. Additionally, the Debtors posted the Sale Notice to the Debtors' case information website located at https://dm.epiq11.com/AXIP.

I.      The Debtors served notice substantially in the form of the *Notice of Proposed Assumption and Assignment of Executory Contracts* attached to the Bidding Procedures Order as **Exhibit 3** (the "*Assumption and Assignment Notice*") [Docket No. 155] on all parties

4936-8444-2269

required to receive such notice under the Bidding Procedures Order and applicable rules.  *See Certificate of Service* [Docket No. 162].

> J.      The notices described in the foregoing paragraphs G-I are good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the assumption and/or assignment of the Assigned Contracts and associated cure costs (the "***Cure Cost***"), the identity of the Purchaser, the Sale Hearing, the Sale Transaction, the Cure Costs, the deadline to submit any Assumption and Assignment Objection or Supplemental Assumption and Assignment Objection, the deadline to submit any Sale Objection or Supplemental Sale Objection, and all other deadlines related thereto is or shall be required.

> K.      **Property of the Estate**. The Acquired Assets sought to be sold and assigned by the Debtors to the Purchaser pursuant to the Purchase Agreement are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

> L.      **Sale Process**.  As demonstrated by the evidence set forth at the Sale Hearing and in the Declaration, the Debtors and their professionals (i) adequately marketed the Acquired Assets in connection with a robust, fair, and open sale process.  The sale process was non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity to any entity to make an offer to purchase the Acquired Assets, among other of the Debtors' assets.  The marketing process undertaken by the Debtors and their professionals with respect to the Acquired Assets has been adequate, appropriate, and reasonably calculated to maximize value for the benefit of the Debtors' estates and all stakeholders.

> M.      **Highest or Otherwise Best Offer**.  The Sale Transaction, including the form and total consideration to be realized by the Debtors under the Purchase Agreement, (i) constitutes the highest or otherwise best offer received by the Debtors for the Acquired Assets,

4936-8444-2269

(ii) is fair and reasonable, and (iii) is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

N.      **Purchaser**.  On the terms and subject to the conditions contained in the Purchase Agreement, the Purchaser agreed to provide, as aggregate consideration for the Acquired Assets (the "*Purchase Price*") (i) the assumption of the Assumed Liabilities and (ii) the Cash Payment, as that term is defined in the Purchase Agreement.

O.      **Business Justification; Fiduciary Duties**. The Debtors have demonstrated that entry into and consummation of the Purchase Agreement constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  The Debtors have demonstrated compelling circumstances for the Sale Transaction outside (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization or liquidation (as the case may be), in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and to maximize the value of the Debtors' estates.  This Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Purchaser pursuant to the terms and conditions set forth in the Purchase Agreement.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  The Assigned Contracts being assigned to the Purchaser are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.

4936-8444-2269

P. The Debtors' decision to enter into the Purchase Agreement and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, officers, and managers. Because the entry into and consummation of the Purchase Agreement constitutes the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, and the professionals or agents shall have or incur no liability to the estates or any holder of a Claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the Purchase Agreement or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the Purchase Agreement, willful misconduct, or fraud, in each case as determined by a court of competent jurisdiction.

Q. **Corporate Authority**. The Debtors (i) have full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken all corporate action necessary to authorize and approve the Purchase Agreement and any actions required to be performed by the Debtors to consummate the Sale Transaction. No further consents or approvals of the Debtors, are required for the Debtors to consummate the Sale Transaction.

R. **Arm's-Length Sale and Purchaser's Good Faith**. The Purchase Agreement was negotiated and undertaken by the Debtors and Purchaser at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Court has considered the insider nature of the Sale Transaction and finds that: (a) the sale process was conducted with appropriate safeguards to ensure fairness; (b) the terms of the Purchase

4936-8444-2269

Agreement reflect arm's-length negotiations; (c) the Purchase Price represents fair value for the Acquired Assets; and (d) the Sale Transaction is in the best interest of the Debtors' estate, their creditors, and all parties in interest.  Neither the Debtors nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code, or to otherwise prevent the consummation of the Sale Transaction.  In the absence of a stay pending appeal, the Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and will be acting in good faith in the closing of the Sale Transaction at any time after entry of this Order.

S.      **No Fraudulent Transfer**. The total consideration provided by the Purchaser pursuant to the Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, or possession thereof, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Purchaser has entered into the Purchase Agreement or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

T.      **Free and Clear Transfer Required by Purchaser**. If the Debtors did not sell the Acquired Assets free and clear of all Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) such a sale would have yielded substantially lower value for the Debtors' estates, with less certainty than the Sale Transaction.  To the extent allowable under

4936-8444-2269

section 365(f) of the Bankruptcy Code, the Purchaser would not have submitted a Bid, entered into the Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, and holders of their equity interests, if the Sale Transaction and the assignment of the Assigned Contracts to the Purchaser were not free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances). Therefore, the Sale Transaction contemplated by the Purchase Agreement free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

U.      As of the Closing Date, pursuant and subject to the terms of the Purchase Agreement and this Sale Order, the transfer of the Acquired Assets and the Sale Transaction will effect a legal, valid, enforceable, and effective transfer of the Acquired Assets and will vest the Purchaser with all of the Debtors' respective rights, title, and interests in the Acquired Assets free and clear of all Encumbrances of any kind or nature whatsoever (other than Assumed Liabilities and Permitted Encumbrances).

V.      **Satisfaction of Bankruptcy Code Requirements**.  The consummation of the Sale Transaction and the assumption and assignment of the Assigned Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363, and 365  of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction contemplated hereby.

W.      **Satisfaction of Section 363(f) Standards**. The Debtors are authorized to sell the Acquired Assets free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) because, with respect to each creditor or other person or entity asserting

4936-8444-2269

an Encumbrance, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each creditor or other person or entity asserting an Encumbrance in the Acquired Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  Creditors or other persons or entities asserting an Encumbrance in or against the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrance.  Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code by having their Encumbrances, if any, in each instance against the Debtors, their estates, or any of the Acquired Assets, attach to the proceeds of the Sale Transaction ultimately attributable to the Acquired Assets in which such holder alleges Encumbrances.

X.     **No Successor or Other Derivative Liability**. The conveyance of the Acquired Assets does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or their estates, and the Purchaser does not constitute a successor to the Debtors or their estates solely by virtue of acquiring the Acquired Assets.  To the fullest extent of the law, the Purchaser's acquisition of the Acquired Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or

4936-8444-2269

unknown and whether asserted or unasserted as of the Closing Date, including but not limited to any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity.  The Purchaser's ownership and use of the Acquired Assets shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Acquired Assets.  The Purchaser would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

Y.      **No Set-Off or Recoupment Claims Against Purchaser.** No Person may assert any set-off, recoupment, or similar claims against the Purchaser or the Acquired Assets based on any Claims against the Sellers or their Affiliates. All Claims against the Sellers or their Affiliates, whether arising before or after the Closing Date, are channeled exclusively to the proceeds of the Sale Transaction and may not be asserted against the Purchaser, the Acquired Assets, or any other assets of the Purchaser.

Z.      **Assigned Contracts**. Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. All counterparties of the Assigned Contracts that did not or do not timely file an objection to the assumption and/or assignment of the Assigned Contract(s) to which they are a counterparty are deemed to consent to the assumption and assignment by the Sellers of their Assigned Contract to the Purchaser, and the Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.  Upon the assignment and sale to the Purchaser in accordance with the terms of the Purchase Agreement, the

4936-8444-2269

Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their predecessors, successors or assigns, shall have no further liability or obligation under the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Purchaser in accordance with the terms of the Purchase Agreement and, other than with respect to Assumed Liabilities and Permitted Encumbrances, the Purchaser shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date (as defined in the Purchase Agreement) and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assigned Contract, that relates to any acts or omissions that arose or occurred prior to the Closing Date (as defined in the Purchase Agreement).  The Sellers have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assigned Contracts being assigned to the Purchaser are an integral part of the Sale Transaction and, accordingly, their assumption and assignment are reasonable and an enhancement to the value of the Debtors' estates.

AA.    **Cure Costs and Adequate Assurance**. Pursuant to the Purchase Agreement, the Cure Costs will be paid by the Purchaser in accordance with the terms of the Purchase Agreement.  The Purchaser has demonstrated adequate assurance of future performance

4936-8444-2269

of each Assigned Contract within the meaning of section 365 of the Bankruptcy Code that is assumed by the Purchaser or any of its permitted assignees to which such Assigned Contract is assumed and assigned by the Debtors, including a promise to perform the Debtors' obligations under such Assigned Contract for periods at or after the Closing Date.  The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assigned Contracts that are assumed.  The Purchaser's payment of Cure Costs and promise under the Purchase Agreement to perform the obligations under the Assigned Contracts as of the Closing Date, after the Closing Date, shall constitute adequate assurance of future performance under such Assigned Contracts.  To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective Assigned Contract(s) to the Purchaser and to have waived any other defaults or breaches.  The Court finds that with respect to all Assigned Contracts, the payment of the Cure Costs as provided in the Purchase Agreement is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Purchaser, of each Assigned Contract to be assumed and assigned to the Purchaser as of the Closing Date.

BB.    **Assets Assignable**. Each and every provision of the documents governing the Acquired Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of

4936-8444-2269

the Acquired Assets, if any, have been or will be satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

CC.    **Sale as Exercise of Business Judgment**. Entry into and consummation of the Purchase Agreement constitutes the exercise by the Debtors of sound business judgment, and such act is in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Purchaser.  Additionally: (i) the Purchase Agreement constitutes the highest and best offer for the Acquired Assets, (ii) the Sale Transaction results in the transfer of onerous and ongoing obligations from the Debtors' estates to the Purchaser, and (iii) the Sale Transaction presents the best opportunity to realize the maximum value of the Acquired Assets and avoid a decline and devaluation of the Acquired Assets; (iv) there is risk of deterioration of the value of the Acquired Assets if the Sale Transaction is not consummated promptly; and (v) the Purchase Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the sale prior to, and outside of, a chapter 11 plan.

DD.    **No Sub Rosa Plan**. The Purchase Agreement and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan.  The Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

EE.    **DIP Obligations**.  On February 25, 2026, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral, (II) Granting*

4936-8444-2269

*Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket. No. 83] (the "***Interim DIP Order***" and the order granting such relief on a final basis [Docket No. 178], the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***").  Pursuant to the DIP Orders, the Acquired Assets constitute DIP Collateral and are subject to the DIP Liens, the Adequate Protection Liens, and the Prepetition Secured Liens (in each case, as such terms are defined in the DIP Orders).  The use of the proceeds from the sale of the Acquired Assets shall comply in all respects with the requirements of the DIP Orders and the DIP Documents and is supported by good, sufficient, and sound business reasons.

FF.    **Time of the Essence; Waiver of Stay.**  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale Transaction must be approved and consummated promptly to preserve and maximize the value of the Acquired Assets. Time, therefore, is of the essence in effectuating the Purchase Agreement.  As such, the Debtors and the Purchaser intend to consummate the sale of the Acquired Assets, will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in doing so, and may consummate the Sale Transaction at any time after the entry of this Sale Order subject to the terms and conditions of the Purchase Agreement. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Purchase Agreement.  Accordingly, cause has been shown as to why this Sale Order should not be subject to any stay, including, without limitation, as provided by Bankruptcy Rules 6004(h), 6006(d), and any applicable Local Bankruptcy Rule.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.    **Approval of Purchase Agreement**. The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Purchase Agreement attached hereto as

4936-8444-2269

**Exhibit 1** and the consummation of the transaction contemplated thereby is authorized and approved.

2. **Objections Overruled**. Any objections and responses to the Motion or the relief requested therein that relate to the Sale Transaction and that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3. **Approval of Sale Transaction**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Purchase Agreement is hereby approved as set forth herein and the Debtors are authorized to take any and all actions necessary to consummate the Sale Transaction, including the sale, transfer, and assignment of all of the Debtors' respective right, title, and interest in, to, and under the Acquired Assets (including leasehold interest) to the Purchaser free and clear of any and all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) in accordance with the terms the Purchase Agreement, with such Encumbrances attaching to the proceeds of the Sale Transaction. The Debtors have satisfied all requirements of §§ 363(b) and 363(f) of the Bankruptcy Code and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) (as defined herein).

4. **Sale and Transfer of Assets Free and Clear**. Pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, the Debtors shall transfer to the Purchaser, upon the Closing Date, all of the Debtors' respective right, title, and interest in and to, and possession of, the Acquired Assets, which shall be immediately vested in Purchaser, and, other than Assumed

4936-8444-2269

Liabilities and Permitted Encumbrances,  such title to the Acquired Assets shall be transferred to

Purchaser shall be free and clear of all Encumbrances including, without limitation:

(a)     any and all charges, liens (statutory or otherwise), claims, mortgages, hypothecations, deeds of trust, pledges, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of setoff, successor liability, easements, servitudes, restrictive covenants, interests or rights under any operating agreement, encroachments, encumbrances, third-party interests, or any other restrictions or limitations of any kind with respect to the Acquired Assets;

(b)     any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under (x) any labor, employment, or pension laws, (y) health or welfare, compensation or other employee plan, agreements, practices, and programs (including any Employee Benefit Plan) of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the forgoing, or (z) any workers' compensation, occupational disease, or unemployment or temporary disability related law, (ii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, and (iii) any and all other claims, causes of action, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third-party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, managers, agents, or successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and bidding process with respect to the Acquired Assets, the Assigned Contracts, or the transactions  contemplated by the Purchase Agreement; and

(c)     any and all equity or other interests of any kind or nature whatsoever in or with respect to (i) any of the Debtors or their respective affiliates, subsidiaries, or successors or assigns,  (ii) the Acquired Assets, or (iii) the Assigned Contracts.

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled,

scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected,

allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or

unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising

4936-8444-2269

by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing Date (collectively, the "***Encumbrances***"). Any and all such Encumbrances shall attach to the proceeds of the Sale Transaction.

5.      **Binding Effect of Order**. This Sale Order and the Purchase Agreement shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of Encumbrances in, against, or on all or any portion of the Acquired Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these Chapter 11 Cases or upon a conversion to case under chapter 7 of the Bankruptcy Code, and the Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.  This Sale Order is and shall be binding upon and govern the acts of all persons, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets; and each of the foregoing persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to the Purchaser

4936-8444-2269

hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  The Purchase Agreement, this Sale Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Purchaser.  To the extent of any conflict between this Sale Order or the Purchase Agreement and such future plan or order, the terms of this Sale Order and the Purchase Agreement shall control.

6.      **No Material Modifications**. The Purchase Agreement and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

7.      **No Bulk Sales**. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Sale Order.

8.      **Valid Transfer**. Effective upon the Closing Date, the transfer to the Purchaser of the Debtors' respective right, title, and interest in the Acquired Assets pursuant to the Purchase Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' respective right, title, and interest in the Acquired Assets, and vests with or will vest in the Purchaser all right, title, and interest of the Debtors in the Acquired Assets, free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

9.      **Fair Consideration**.  The consideration provided by the Purchaser for the Acquired Assets under the Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the

4936-8444-2269

Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, or possession thereof, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or any other applicable law.  Neither the Debtors nor the Purchaser have entered into the Purchase Agreement, or any agreement contemplated thereby  or are consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

10.     The Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors, the Purchaser, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

11.     **Good Faith Purchaser**. The Sale Transaction contemplated by the Purchase Agreement is undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code.  Notwithstanding the Purchaser's status as an insider of the Debtors, the Purchaser has acted without collusion in undertaking the Sale Transaction contemplated by the Purchase Agreement.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the

4936-8444-2269

Acquired Assets to the Purchaser (including the assumption and assignment by the Debtors of any of the Assigned Contracts), unless such authorization is duly stayed pending such appeal.  The Purchaser is a good faith purchaser of the Acquired Assets,  and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

12.     **Governmental Authorization to Effectuate Sale and Assignments**. Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction. Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Closing Date, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.  No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction.  For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

13.     **Authorization to Assign**. Notwithstanding any provision of any contract governing the Acquired Assets, including any Assigned Contract to be assumed and assigned to the Purchaser as of the Closing Date, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the

4936-8444-2269

Acquired Assets, including any Assigned Contract, at or after the Closing Date, the Debtors are authorized to (i) assign the Acquired Assets to the Purchaser and (ii) assume and assign the Assigned Contracts to the Purchaser as of the Closing Date, in each case, which assignments shall take place on and be effective as of the Closing Date or such other date after the Closing Date, in each case, as provided in the Purchase Agreement or as otherwise provided by a separate order of this Court.

(a)     There shall be no accelerations, assignment fees, increases, or any other fees charged to the Purchaser or the Debtors as a result of the assignment of the Acquired Assets or the assumption and/or assignment of the Assigned Contracts.

(b)     The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are to be assumed and assigned to the Purchaser as of the Closing Date.  Notwithstanding the foregoing, unless required by the Purchaser under the Purchase Agreement for the Debtors to assume and assign any Assigned Contract, no Debtor shall be required by the Court to assume and assign any Assigned Contract, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract.

(c)     The Debtors' assumption and assignment of the Assigned Contracts is subject to the consummation of the Sale Transaction with the Purchaser.  To the extent that an Assumption and Assignment Objection (or Supplemental Assumption and Assignment Objection) by a counterparty to any Assigned Contract, including an objection related to the applicable Cure Cost, is not resolved prior to the Closing Date, the Purchaser, may, without any further approval of the Court or notice to any party, elect to (i) not have the Debtors assume and assign such Assigned Contract to it, or (ii) have the Debtors postpone the assumption of such Assigned Contract until the resolution of such Assumption and Assignment Objection (or Supplemental Assumption and Assignment Objection); *provided*, *however*, that the Debtors, the Purchaser, and the relevant non-debtor counterparty under each Assigned Contract shall have authority to compromise, settle, or otherwise resolve any objections to proposed Cure Costs without further order of, or notice to, this Court, with any such agreed upon Cure Costs being paid to the appropriate counterparty by the Purchaser as a condition subsequent to such assumption and/ assignment of the relevant Assigned Contract.

4936-8444-2269

14.      **Assigned Contracts.** As of the Closing Date, subject to the provisions of this Sale Order and in accordance with the Purchase Agreement, the Purchaser shall succeed to the entirety of the Debtors' respective rights and obligations in the Assigned Contracts first arising and attributable to the time period occurring on or after the Closing Date (as defined in the Purchase Agreement) and shall have all rights thereunder.

(a)      Upon Closing, (i) all defaults (monetary and non-monetary) under the Assigned Contracts shall be deemed cured and satisfied in full through the payment of the Cure Costs, (ii) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before the Closing Date with respect to the Assigned Contracts, and (iii) any and all persons or entities shall be forever barred and estopped from asserting a Claim against the Debtors, their estates, the Purchaser, or the Acquired Assets that any additional amounts are due or defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing Date (other than claims against Purchaser with respect to the Assumed Liabilities). The Purchaser's promise pursuant to the terms of the Purchase Agreement to pay the Cure Costs and the Purchaser's promise to perform the Debtors' obligations under the Assigned Contracts for the period on or after the Closing Date shall constitute adequate assurance of Purchaser's future performance under the Assigned Contracts being assigned to it as of the Closing Date within the meaning of sections 365(b)(l)(C) and (f)(2)(A)-(B) of the Bankruptcy Code.

(b)      Upon assumption of those Assigned Contracts to be assumed by the Debtors and assigned to the Purchaser as of the Closing Date, such Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in such Assigned Contract or other restrictions prohibiting assignment or transfer. To the extent any Assigned Contract is assumed and assigned to the Purchaser under this Sale Order, such assumption and assignment will not take effect until the Closing Date. Furthermore, other than the Assigned Contracts, no other contract shall be deemed assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of such Assigned Contract.

4936-8444-2269

(c)     Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of or obligations under any Assigned Contract following the effective date of such assumption and assignment to the Purchaser, subject to the payment of the Cure Costs by the Purchaser in accordance with the terms of the Purchase Agreement.

(d)     All counterparties to the contracts to be assumed and assigned to Purchaser as of the Closing Date shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

(e)     Notwithstanding the foregoing, the Debtors may, at the Purchaser's direction, amend Schedule 1.1(a) of the Purchase Agreement to add or remove any Assigned Contract to or from such Schedule 1.1(a) prior to the Closing Date of the Sale Transaction in accordance with the terms of the Purchase Agreement.

15.     **Injunction**. Except as expressly provided in the Purchase Agreement or this Sale Order, effective upon the Closing Date, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons or entities holding Liens, Claims, or Interests (other than Assumed Liabilities and Permitted Encumbrances) against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity or otherwise), shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Liens, Claims, or Interests against the Purchaser or any of its members or their respective affiliates, agents, advisors, representatives, officers, successors and assigns, the Acquired Assets, or the interests of the Debtors or the

4936-8444-2269

Purchaser in the Acquired Assets, including, without limitation, taking any of the following actions with respect to an interest (other than, with respect to the Purchaser only, the Assumed Liabilities and Permitted Encumbrances): (a) commencing or continuing in any manner any action or other proceeding against such parties or the Acquired Assets; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against such parties or the Acquired Assets; (c) creating, perfecting or enforcing any liens, claims, encumbrances or other interests against such parties or the Acquired Assets; (d) asserting a claim as a setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser or its affiliates, agents, advisors, representatives, officers, successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof.  All persons and entities are hereby enjoined from taking any action that would interfere with or adversely affect the Debtors' ability to transfer the Acquired Assets in accordance with the terms of the Purchase Agreement and this Sale Order.  Following the Closing Date, no holder of Encumbrances (including an "interest" as such term is used in section 363(f)) against the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets.

16.     **No Successor Liability**.  As of and following the Closing Date, except as provided in the Purchase Agreement, the entry of this Order and the approval of the terms of the Purchase Agreement shall mean that the Purchaser (and any of its affiliates, successors, or assigns), as a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Acquired Assets, shall not be deemed to: (a) be a legal successor or successor employer to any Debtor (including with respect to any health or benefit plans), or

4936-8444-2269

otherwise be deemed a successor to any Debtor, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into any Debtor; (c) be an alter ego or a mere continuation or substantial continuation of any Debtor or the enterprise of any Debtor; or (d) be liable or have any liability for any acts or omissions of any Debtor in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in the Purchase Agreement, including, in the case of each of (a)-(d), without limitation, in respect of (1) to the greatest degree allowed by applicable law, any environmental liabilities, debts, claims or obligations arising from conditions first occurring or first existing on or prior to the Closing Date, (2) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or (3) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

17.     **Surrender of Possession.** Any and all Acquired Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Purchaser free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) and shall be delivered to the Purchaser and deemed delivered at the time of the Closing Date (or such other time as provided in the Purchase Agreement).

18.     **Release of Encumbrances**. Effective upon the Closing Date, this Sale Order: (a) is and shall be effective as a determination that all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) of any kind or nature whatsoever existing as to the Acquired Assets

4936-8444-2269

prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; (b) is and shall be binding upon and shall govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Purchaser; (c) and all recorded Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) against the Acquired Assets shall be deemed stricken from such persons' and entities' records, official and otherwise.

19.     **Approval to Release Interests.** If any person or entity that has filed financing statements, mortgages, mechanic's liens or other documents or agreements evidencing Liens, Claims, or Interests in or against the Acquired Assets shall not have delivered to the Debtors before the Closing Date, in proper form for filing and executed by the appropriate parties, the appropriate documentation with respect to the release of such Liens, Claims, or Interests, the Purchaser is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets. On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably requested by the Purchaser, in each case, at the Seller's sole expense, to release its Liens, Claims or other Interests in the Acquired Assets, if any, other than Permitted Encumbrances, as such encumbrances may have been recorded or may otherwise exist. Subject to the payment of the DIP Obligations, the Purchaser is hereby authorized to file, register, or

4936-8444-2269

otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, or Interests against the Acquired Assets (other than the Assumed Liabilities and Permitted Encumbrances). A certified copy of this Sale Order may be: (i) filed with the appropriate clerk; (ii) recorded with the recorder; or (iii) filed or recorded with any other governmental agency to act to cancel any Liens, Claims, or Interests against the Acquired Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

20.     **Transfer of Marketable Title**. As of the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtors' respective right, title and interest in the Acquired Assets and/or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser at the Closing pursuant to the terms of the Purchase Agreement, free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).  This Sale Order is, and shall be, effective as a determination that, upon the Closing Date, all Encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.

21.     **Governmental Entities**. Nothing in this Sale Order or the Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any person or entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order.  Nothing in this Sale Order or the Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit,

4936-8444-2269

(c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

22.     Nothing in this Sale Order or related documents (including but not limited to the Purchase Agreement) discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("***Governmental Unit***") that is not a "claim" as defined in 11 U.S.C. § 101(5); (ii) any such claim of a Governmental Unit arising upon or after the entry order confirming any chapter 11 plan; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any person or entity would be subject to as the owner or operator of property after the entry order confirming any chapter 11 plan; or (iv) any liability to a Governmental Unit on the part of any person or entity other than the Debtors. Nor shall anything in this Sale Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

23.     **Satisfaction of Conditions Precedent.** Neither the Purchaser nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Purchase Agreement to each of their respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Purchase Agreement.

24.     **Retention of Jurisdiction**. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Sale Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Sale Order (including the exculpation, release and injunctive provisions in this Sale Order) and the terms of

4936-8444-2269

the Purchase Agreement, all amendments thereto and any waivers and consents thereunder; (ii) protect the Purchaser, or the Acquired Assets, from and against any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances); (iii) compel delivery of all Acquired Assets to the Purchaser; (iv) compel the Debtors and the Purchaser to perform all of their respective obligations under the Purchase Agreement; and (v) resolve any disputes arising under or related to the Purchase Agreement or the Sale Transaction.

25.     **Automatic Stay**. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

26.     **Immediate Effect**. Notwithstanding any provision of the Bankruptcy Rules, including Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale Transaction, and the Debtors and the Purchaser are free to close the Sale Transaction under the Purchase Agreement at any time pursuant to the terms thereof and take any other action or perform any act authorized by this Sale Order.

27.     **Failure to Specify Provisions**. The failure to specifically reference any particular provisions of the Purchase Agreement or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement and other related documents be authorized and approved in their entirety.

4936-8444-2269

28.	**Provisions Non-Severable**. The provisions of this Sale Order are non-severable and mutually dependent.

Dated: _____, 2026
Houston, Texas

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　THE HONORABLE CHRISTOPHER M. LOPEZ
　　　　　　　　UNITED STATES BANKRUPTCY JUDGE

4936-8444-2269

**Exhibit 1**

**Purchase Agreement**

4936-8444-2269

**ASSET PURCHASE AGREEMENT**

**DATED AS OF** April 6 , 2026

**BY AND AMONG**

**E4 ENERGY SERVICES, LLC, AS PURCHASER,**

**AND**

**E3 COMPRESSION HOLDINGS LLC,**

**AXIP ENERGY SERVICES, LP**

**AND**

**ITS SUBSIDIARIES AND AFFILIATES SIGNATORY HERETO**

**AS THE SELLERS**

110009169.3

## TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS;  ASSUMPTION OF
 ASSUMED LIABILITIES............................................................................................. 1
  Section 1.1  Purchase and Sale of the Acquired Assets...................................... 1
  Section 1.2  Excluded Assets ............................................................................. 2
  Section 1.3  Assumption of Certain Liabilities................................................... 3
  Section 1.4  Excluded Liabilities ....................................................................... 3
  Section 1.5  Assumption and Assignment of Certain Contracts......................... 6

ARTICLE II CONSIDERATION; PAYMENT; CLOSING....................................................... 7
  Section 2.1  Consideration; Payment................................................................. 7
  Section 2.2  Deposit .......................................................................................... 7
  Section 2.3  Closing .......................................................................................... 8
  Section 2.4  Closing Deliveries by the Sellers................................................... 8
  Section 2.5  Closing Deliveries by Purchaser.................................................... 9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS...................... 9
  Section 3.1  Organization and Qualification....................................................... 9
  Section 3.2  Authorization of Agreement ........................................................ 10
  Section 3.3  Conflicts; Consents ..................................................................... 10
  Section 3.4  Material Contracts........................................................................ 11
  Section 3.5  Title to Acquired Assets............................................................... 12
  Section 3.6  [reserved] .................................................................................... 12
  Section 3.7  Assigned Contracts ..................................................................... 12
  Section 3.8  Permits ........................................................................................ 12
  Section 3.9  Compliance with Laws ................................................................ 12
  Section 3.10  Legal Proceedings; Orders .......................................................... 13
  Section 3.11  [reserved] .................................................................................... 13
  Section 3.12  [reserved] .................................................................................... 13
  Section 3.13  Related Party Transactions .......................................................... 13
  Section 3.14  Brokers........................................................................................ 13
  Section 3.15  [reserved] .................................................................................... 13
  Section 3.16  Acquired Assets .......................................................................... 13
  Section 3.17  Environmental Matters................................................................. 13
  Section 3.18  Intellectual Property..................................................................... 14
  Section 3.19  [reserved] .................................................................................... 15
  Section 3.20  Taxes........................................................................................... 15
  Section 3.21  No Other Representations or Warranties ...................................... 15

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER...................... 16
  Section 4.1  Organization and Qualification..................................................... 16
  Section 4.2  Authorization of Agreement ........................................................ 16
  Section 4.3  Conflicts; Consents ..................................................................... 16
  Section 4.4  Sufficient Funds .......................................................................... 17
  Section 4.5  No Litigation................................................................................ 17
  Section 4.6  Brokers........................................................................................ 17

i

110009169.3

Section 4.7    No Additional Representations or Warranties ............................. 17
Section 4.8    No Outside Reliance ...................................................................... 18

ARTICLE V COVENANTS AND AGREEMENTS .......................................................... 18
Section 5.1    Conduct of the Sellers .................................................................. 18
Section 5.2    Competing Bids ............................................................................ 21
Section 5.3    Bankruptcy Matters ...................................................................... 21
Section 5.4    Permits and Governmental Approvals Cooperation .................... 22
Section 5.5    Efforts to Closing; Access; Further Assurances; Transition
              Services ......................................................................................... 22
Section 5.6    Notice of Certain Events ............................................................. 24
Section 5.7    Tax Matters .................................................................................. 24
Section 5.8    [reserved] ..................................................................................... 25
Section 5.9    Confidentiality ............................................................................. 25
Section 5.10   Governmental Approvals and Consents........................................ 25
Section 5.11   Public Announcement................................................................... 26
Section 5.12   Receipt of Misdirected Assets; Liabilities ................................... 26
Section 5.13   Satisfaction of Postpetition Liabilities........................................ 27
Section 5.14   No Successor Liability .................................................................. 27

ARTICLE VI CONDITIONS TO CLOSING ................................................................... 27
Section 6.1    Conditions Precedent to the Obligations of Purchaser and the
              Sellers........................................................................................... 27
Section 6.2    Conditions to Obligations of Purchaser ....................................... 28
Section 6.3    Conditions to Obligations of Sellers ............................................ 29
Section 6.4    Waiver of Conditions.................................................................... 29

ARTICLE VII TERMINATION ..................................................................................... 29
Section 7.1    Termination of Agreement............................................................ 29
Section 7.2    Effect of Termination.................................................................... 31

ARTICLE VIII SURVIVAL & INDEMNIFICATION ...................................................... 32
Section 8.1    Non-Survival of Representations and Warranties and Certain
              Covenants; Certain Waivers ........................................................ 32
Section 8.2    Purchaser's Indemnification Obligations....................................... 32
Section 8.3    Indemnification Actions................................................................ 32

ARTICLE IX MISCELLANEOUS .................................................................................. 34
Section 9.1    Expenses ....................................................................................... 34
Section 9.2    Approval ....................................................................................... 35
Section 9.3    Notices .......................................................................................... 35
Section 9.4    Binding Effect; Assignment.......................................................... 36
Section 9.5    Amendment and Waiver ............................................................... 36
Section 9.6    Third Party Beneficiaries ............................................................. 36
Section 9.7    Non-Recourse ............................................................................... 36
Section 9.8    Severability ................................................................................... 37
Section 9.9    Construction.................................................................................. 37

ii

110009169.3

Section 9.10   Complete Agreement ........................................................................ 37
Section 9.11   Specific Performance ........................................................................ 37
Section 9.12   Jurisdiction and Exclusive Venue ..................................................... 38
Section 9.13   Governing Law; Waiver of Jury Trial ............................................... 38
Section 9.14   No Right of Set-Off .......................................................................... 39
Section 9.15   Counterparts and PDF ....................................................................... 39
Section 9.16   Bulk Sales Laws ............................................................................... 39
Section 9.17   Sellers' Representative ...................................................................... 39

ARTICLE X ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS .................... 40
Section 10.1   Certain Definitions ........................................................................... 40
Section 10.2   Rules of Interpretation ...................................................................... 49

**Exhibit A**     Bill of Sale

iii

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (this "Agreement"), dated as of __April 6__, 2026 (the "Execution Date"), is made by and among, E4 Energy Services, LLC, a Texas limited liability company ("Purchaser"), E3 Compression Holdings LLC, a Delaware limited liability company ("E3"), Axip Energy Services, LP, a Texas limited partnership ("Axip Energy" and, collectively with its Subsidiaries and Affiliates signatory hereto, and E3, the "Sellers" and each a "Seller"). Purchaser and the Sellers are referred to herein individually as a "Party" and together as the "Parties." Capitalized terms used herein shall have the meanings set forth herein including Article X.

WHEREAS, Sellers commenced a voluntary case under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") (collectively, the "Bankruptcy Cases") and the Parties desire to enter into this Agreement in accordance with the Sale Order.

NOW, THEREFORE, the Parties hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1  Purchase and Sale of the Acquired Assets.** Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order at the Closing, each Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from such Seller, all of such Seller's right, title and interest in and to the Acquired Assets, free and clear of any and all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of such Seller's right, title and interest in and to, as of the Closing, the properties, rights, interests and other tangible and intangible assets of the Sellers set forth below:

(a)  Any and all Intellectual Property held or owned by the Sellers that is related or predominantly related to the Sustainable Products Group (the "Assigned Intellectual Property"), including all of the assets listed on Schedule 1.1(a) (and subject to Section 1.5 hereof, the Contracts set forth thereon, the "Assigned Contracts");

(b)  all of Sellers' rights under warranties, indemnities and all similar rights against third parties relating to the Acquired Assets;

(c)  all actual or potential claims and causes of action of the Sellers' bankruptcy estates under Section 547 and Section 548 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or similar action under other applicable Law against Sellers' Transferred Employees, vendors, customers, service providers, or counterparties to the Assigned Contracts arising out of, or related to, the Acquired Assets; and

(d)  originals, or where not available, copies, of all books, records, files, and documents (in each case whether or not in electronic form), research and development files, records and data (including all correspondence with any Governmental Body), sales

110009169.3

material and records, strategic plans, internal financial statements, marketing and promotional surveys, in each case, to the extent related to any Acquired Asset (collectively, "Books and Records"); provided, however, that the following shall not constitute "Books and Records": (i) any books, records, files or documents of any Seller to the extent related to any Excluded Assets, and (ii) any books, records, files or documents of any Seller that are subject to attorney-client privilege, attorney work product protection or any other applicable privilege, protection or immunity, in the case of clause (iii), (x) related to the Bankruptcy Cases and any actions taken in connection therewith, including the Transactions, or (y) any Excluded Liability ((i) and (ii) collectively, the "Excluded Books and Records").

**Section 1.2**   **Excluded Assets**.   Notwithstanding anything to the contrary in this Agreement, nothing contained herein shall be deemed to sell, transfer, assign, convey or deliver to Purchaser any right, title or interest in or to any assets other than the Acquired Assets, and in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and such Seller shall retain all right, title and interest to, in and under any of the following assets, properties, rights or interests of the Sellers (collectively, with any and all other assets, properties, rights or interests of Sellers that are not Acquired Assets, the "Excluded Assets"):

(a)   all cash and cash equivalents wherever located;

(b)   all Contracts that are not Assigned Contracts (the "Excluded Contracts");

(c)   all pre-paid expenses, deposits and retainers unrelated to the Acquired Assets;

(d)   all of Sellers' rights, interests, claims, demands and causes of action under all Excluded Contracts and leases;

(e)   all rights, claims or causes of action for, under or relating to the Excluded Assets or Excluded Liabilities, including any such item to the extent arising under any guarantee, warranty, indemnity, policy or agreement of insurance, or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability;

(f)   any and all claims of the Sellers for refunds of, credits attributable to, loss carryforwards with respect to or similar Tax assets relating to (i) Income Taxes of the Sellers or any of their Affiliates, and (ii) Taxes attributable to the Excluded Assets and (iii) Non-Income Taxes due prior to the Closing Date;

(g)   any Seller Benefit Plan and the Sellers' and their respective Subsidiaries' right, title and interest in any assets of or relating to any Seller Benefit Plan;

(h)   any records, documents or other materials containing information relating to current or former Employees;

(i)   the Excluded Books and Records;

(j)   all rights of Sellers under this Agreement;

2

110009169.3

(k)     any Equity Interests in any Seller;

(l)     all accounts or notes receivable held by Sellers and any security, claim, remedy or other right related to the foregoing; and

(m)     all Personal Property (i) within real property or (ii) used primarily by an employee of any Seller or any of their respective Affiliates (the "Excluded Personal Property").

**Section 1.3     Assumption of Certain Liabilities.**  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall assume from each Seller (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and such Seller shall transfer, assign, convey and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     all Liabilities arising out of or relating to the ownership and operation of the Acquired Assets, but in all events only to the extent that such Liabilities thereunder (i) first arise after the Closing, (ii) are attributable to the period commencing immediately after Closing, and (iii) do not relate to any breach, default or violation by Sellers at or prior to the Closing, it being understood that Liabilities arising from or attributable to the ownership and operation of the Acquired Assets prior to the Closing; and

(b)     all Liabilities for (i) all Transfer Taxes and (ii) all Non-Income Taxes that are due on or after the Closing Date.

**Section 1.4     Excluded Liabilities.**  Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers of any kind or nature whatsoever, however and whenever arising, whether existing currently or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing (collectively, the "Excluded Liabilities").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of Sellers:

(a)     any Liabilities of Sellers arising or incurred in connection with, or related to, the negotiation, preparation, investigation and performance of this Agreement and the Transactions, including fees and expenses of counsel, accountants, consultants, advisers and others;

(b)     any Liabilities of Sellers related to any professional retained pursuant to Sections 327, 363 and 1103 of the Bankruptcy Code in the Bankruptcy Cases;

(c)     all Liabilities of Sellers for fees, costs and expenses that have been incurred or that are incurred or owed by the Sellers or of any of their predecessors in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by the Sellers) and administrative expenses and priority claims accrued through the Closing Date and any post-Closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which any such amounts

3

shall be paid by the Sellers) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the Transactions, and (ii) the consummation of the Transactions, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of the Sellers or of any of their predecessors payable as a result of the consummation of the Transactions;

(d)  any Liabilities of Sellers for (i) all Income Taxes of Sellers (or Affiliate of Sellers), without regard to whether such Income Taxes relate to periods (or portions thereof) ending prior to the Closing; (ii) Non-Income Taxes that are due prior to the Closing; (iii) Taxes attributable to the Excluded Assets or (iv) subject to Section 5.7(a), Taxes of Sellers that arise out of the consummation of the Transactions;

(e)  any Liabilities of Sellers or their Subsidiaries relating to or arising out of the Excluded Assets;

(f)  all Liabilities of Sellers or their Subsidiaries for Indebtedness and any other Liabilities associated with debt, loans or credit facilities of Sellers owing to financial institutions;

(g)  guarantees of Indebtedness made by the Sellers and all reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or other similar agreements or instruments;

(h)  any Liabilities of Sellers in respect of any Claim, or threatened Claim, (i) arising out of, relating to or otherwise in respect of the operation of the Sustainable Products Business or the Acquired Assets to the extent such Claim relates to such operation on or prior to the effective time of the Closing (whether or not such claim was disclosed pursuant to Section 3.10), or (ii) against Sellers;

(i)  any Liabilities of Sellers resulting from the resolution or settlement of any Claim or Order to which Sellers or any of their Affiliates is a party or otherwise subject, but excluding any Liabilities of Purchaser or any of its Affiliates resulting from the resolution or settlement of any Claim or Order to which Sellers or their Affiliates and Purchaser or its Affiliates are a party or otherwise subject;

(j)  except to the extent expressly included as an Assumed Liability, any Liability of Sellers for injury to a Person or property which (i) relates to any product sold, manufactured, held or marketed by, or on behalf of, any Seller or any Affiliate of any Seller prior to the effective time of Closing, (ii) relates to any service provided or marketed by, or on behalf, of any Seller prior to the effective time of Closing, or (iii) arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by any Seller;

(k)  any Liabilities of Sellers for any current or former employees, officers, directors, retirees, individual independent contractors or individual consultants of Sellers;

4

110009169.3

(l)  all Liabilities related to the WARN Act, to the extent applicable, with respect to the Sellers' termination of employment of the Sellers' employees on or prior to the Closing Date;

(m)  any Liabilities of Sellers to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Sellers (including with respect to any breach of fiduciary obligations by same);

(n)  any Liabilities of Sellers under the Excluded Contracts, including any Liabilities arising out of the rejection of any such Contracts pursuant to Section 365 of the Bankruptcy Code;

(o)  any Liabilities of Sellers under any Contracts, Leases, or Permits of Sellers (i) which are not validly and effectively assigned, or transferred, as applicable, to Purchaser pursuant to this Agreement; or (ii) to the extent such Liabilities arise out of or relate to a breach by Sellers of such Contracts or Leases or noncompliance with such Permits prior to the effective time of the Closing;

(p)  all Liabilities of the Sellers or of any of their predecessors to their respective equity holders, including with respect to any dividends, distributions in liquidation, redemptions of interests, option payments or otherwise;

(q)  all Liabilities of Sellers arising out of or relating to any business or property formerly owned or operated by Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by Sellers;

(r)  any drafts, wires, ACH, electronic payment or checks outstanding of Sellers as of the Closing;

(s)  any "de facto merger" or "successor-in-interest" theories of Liability or fraudulent transfer or conveyance Law;

(t)  all outstanding intercompany account balances of Axip Energy and Axip Leasing Company, LLC, a Texas limited liability company;

(u)  all trade accounts payable and any other accounts payable, together with all related Liabilities, including with regard to any security, claim or remedy;

(v)  all Liabilities with respect to any Seller Benefit Plan and any Liabilities of Sellers arising under Title IV of ERISA, Section 302 of ERISA, Sections 412, 430, 4971 or 4980B of the Code;

(w)  any successor employer Liabilities under ERISA or applicable employment Laws; and

(x)  any Liabilities of Sellers arising out of, in respect of or in connection with the failure by Sellers or any of their Affiliates to comply with any Law or Order.

5

**Section 1.5** **Assumption and Assignment of Certain Contracts**. The Sale Order shall provide for the assignment of the Assigned Contracts by the applicable Seller(s), to the maximum extent permitted by Law, to Purchaser, and the assumption by Purchaser of the Assigned Contracts (and all Assumed Liabilities relating thereto), effective upon the Closing in accordance with Section 1.1 and this Section 1.5.

(a) At the Closing, the Sellers shall assign, to the maximum extent permitted by Law, to Purchaser and Purchaser shall assume the Assigned Contracts and all Assumed Liabilities relating thereto.

(b) If the Sellers' assumption and assignment of any Assigned Contract by Sellers to Purchaser requires the consent of any Governmental Body or other third party to permit such assumption and assignment by the Sellers to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, then Purchaser and the applicable Seller shall use commercially reasonable efforts before the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Bodies and third parties necessary to assign such Assigned Contract to Purchaser and for Purchaser to assume such Assigned Contract; provided, however, that none of the Sellers shall be required to pay any amount or incur any obligation to any Person from whom such Consent or Governmental Authorization may be required in order to obtain such Consent or Governmental Authorization with respect to any Assigned Contract.

(c) Notwithstanding any provision herein to the contrary, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to or assumed by Purchaser to the extent that such Contract (i) is terminated by any party thereto other than a Seller or its Subsidiary, or terminates or expires by its terms, prior to the Closing and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the Sellers' or their Subsidiaries' rights under such Contract, if such Consent or Governmental Authorization has not been obtained.

(d) Notwithstanding anything to the contrary in this Agreement, to the extent any Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any Order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of Sellers' right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to the Closing, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this Section 1.5(d), then after the Closing and through the earlier of such time as such Consent or Governmental Authorization is obtained or the election of Purchaser, by written notice to Sellers and in the sole discretion of Purchaser, not to pursue any such Consent or Governmental Authorization, (A) Sellers shall use commercially reasonable efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing, and (B) Sellers and Purchaser shall cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser or Sellers under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or

110009169.3

violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Sellers or their Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (ii) provided, and to the extent, that Purchaser receives such economic rights and benefits, Purchaser shall assume and timely discharge any related burden (net of the amount of any related Tax benefit obtained by Sellers or any of their Affiliates) and obligation with respect to such Acquired Asset.  Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Sellers' right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order.  Any Seller retaining such Acquired Asset due to the failure to receive such Consent or Governmental Authorization will not be required, in connection with the foregoing, to make any payments or offer or grant any accommodation (financial or otherwise, regardless of any provision to the contrary in the underlying Contract, including any requirements for the securing or posting of any bonds, letters of credit or similar instruments, or the furnishing of any guarantees) to any third party, except to the extent that Purchaser agrees to reimburse and make whole such Seller, to such Seller's reasonable satisfaction, for any payment or other accommodation made by such Seller at the request of Purchaser.  Notwithstanding any provision in this Section 1.5 to the contrary, Purchaser shall not be deemed to have waived its rights under Section 6.2 hereof unless and until Purchaser either provides written waivers thereof or elects to proceed to consummate the Transactions at Closing.  The obligations set forth in this Section 1.5 will terminate 90 days after the Closing (except with respect to any Acquired Asset for which requisite Consent or Governmental Authorization has been granted, but such Acquired Asset has not yet been transferred and assigned, as to which such obligations will continue).

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

**Section 2.1** **Consideration; Payment**.  The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (a) the assumption of Assumed Liabilities and (b) a cash payment in an amount equal to (i) $1.00 (the "Cash Payment").  At the Closing, Purchaser shall deliver, or cause to be delivered, to E3, the Cash Payment and shall assume the Assumed Liabilities.  The Cash Payment shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the Sellers at least two (2) Business Days prior to the date such payment is to be made.

**Section 2.2** **Deposit**.  No later than 5:00 p.m. (prevailing Central Time) on _____, 2026, Purchaser shall make one or more earnest money deposits to an account managed by the Escrow Agent pursuant to the Escrow Agreement, by bank wire transfer of immediately available funds, in an amount equal to $1.00 (such amount, together with all investment income received in respect thereof, if any, the "Deposit").  The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Sellers or Purchaser.  If Closing occurs, the Deposit shall be credited against the amount required to be paid by Purchaser to Sellers at the Closing.  If this Agreement is terminated pursuant to Section 7.1(f) or Section 7.1(i), then, within five (5) Business Days of such termination, the Parties shall jointly instruct the Escrow

7

Agent to release the Deposit to E3 (or, in the case of a termination pursuant to Section 7.1(i), only that portion of the Deposit equal to the reasonable and documented expenses actually incurred by Sellers in connection with the Transactions up to an aggregate amount equal to one percent (1%) of the Cash Payment to E3 and the remainder of the Deposit to Purchaser), as Sellers' sole and exclusive remedy against Purchaser with respect to any breach, violation, or default by Purchaser under this Agreement that results in this Agreement being terminated pursuant to Section 7.1(f) or Section 7.1(i), except for any remedies of Sellers with respect to the surviving provisions of this Agreement pursuant to Section 7.2(a). Each of the Parties acknowledges and agrees that the agreements contained in this Section 2.2 with respect to the Deposit are an integral part of this Agreement and that the receipt of the Deposit by Sellers upon a termination pursuant to Section 7.1(f) is not a penalty, but rather represents liquidated damages in a reasonable amount that will reasonably compensate Sellers in the circumstances in which the Deposit is payable, for the efforts and resources expended and opportunities foregone by Sellers while negotiating and pursing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. If this Agreement is terminated prior to Closing for any other reason, then the Parties shall jointly instruct the Escrow Agent to release the Deposit to Purchaser within five (5) Business Days of such termination.

**Section 2.3    Closing.** The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, and the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference or electronic exchange of documents at 10:00 a.m. Central Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VI (other than conditions that by their terms or nature are to be satisfied at the Closing), but in no event sooner than the date that is seven (7) Business Days following the entry of the Sale Order, or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date." The Closing shall be effective as of 12:01 a.m. Central Time on the Closing Date for all purposes of this Agreement, including for Tax and accounting purposes.

**Section 2.4    Closing Deliveries by the Sellers.** At or prior to the Closing, the Sellers shall deliver to Purchaser:

(a)    a bill of sale and an assignment and assumption agreement in substantially the form attached hereto as Exhibit A (the "Assignment and Assumption Agreement") duly executed by the Sellers;

(b)    an IRS Form W-9 executed by each Seller (or, if such Seller is disregarded, its regarded owner for U.S. federal income tax purposes);

(c)    a certificate, dated as of the Closing Date and signed by a duly authorized officer of Sellers, that each of the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied;

(d)    a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Sellers certifying (1) that attached thereto are true and complete copies of all resolutions

8

adopted by the board of directors (or equivalent governing body) of Sellers authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transactions, and (2) the names and signatures of the officers of Sellers authorized to sign this Agreement and the other documents to be delivered hereunder and thereunder;

(e)     a copy of the Sale Order;

(f)     in accordance with <u>Section 2.2,</u> a written instruction instructing the Escrow Agent to release the Deposit to Sellers; and

(g)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement and consummate the Transaction.

**Section 2.5    Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to (or at the direction of) the Sellers:

(a)     the Cash Payment, less the Deposit, (which amount shall be paid free and clear of, and without any deduction or withholding on account of, any Tax if the forms set forth in <u>Section 2.4(b)</u> are provided by the Sellers);

(b)     in accordance with <u>Section 2.2,</u> a written instruction instructing the Escrow Agent to release the Deposit to Sellers; and

(c)     the Assignment and Assumption Agreement, duly executed by Purchaser.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Any matter set forth in any section of the Disclosure Schedules shall be deemed to be referred to and incorporated in any section to which it is specifically referenced or cross-referenced and also in all other sections of the Disclosure Schedules, as applicable, to which such matter's application or relevance is reasonably apparent on its face (even if there is any language on any such section that indicates there are no other disclosures applicable to such section). Except as disclosed in the correspondingly numbered section of the Disclosure Schedules (whether or not an express reference to the Disclosure Schedules is included herein), each Seller represents and warrants to Purchaser solely as of the Execution Date and the Closing Date as follows:

**Section 3.1    Organization and Qualification**. Such Seller is duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation and has full corporate, limited liability company or limited partnership power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to operate the Acquired Assets as operated as of the date of this Agreement. Such Seller is duly licensed or qualified to do business under the Laws of each jurisdiction in which the nature of the operation of the Acquired Assets operated by it makes such licensing or qualification necessary, except where failure to be so licensed, qualified or in good standing would not,

9

110009169.3

individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Section 3.1 of the Disclosure Schedules sets forth (i) all Subsidiaries of each Seller and (ii) all equity interests owned by Sellers in any other Person.

**Section 3.2    Authorization of Agreement**.    Subject to requisite Bankruptcy Court approvals:

(a)    Such Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which such Seller is a party and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by such Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c)    this Agreement and the other Transaction Agreements to which such Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto and the Bankruptcy Court's entry of the Sale Order, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

**Section 3.3    Conflicts; Consents**.    Assuming that (a) requisite Bankruptcy Court approvals are obtained, and (b) he notices, authorizations, approvals, Orders, permits or consents set forth in Section 3.3 of the Disclosure Schedules are made, given or obtained (as applicable), neither the execution and delivery by such Seller of this Agreement or the other Transaction Agreements, nor the consummation by such Seller of the Transactions, nor performance or compliance by such Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of such Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement or other governing documents, as applicable; (ii) violate any Law or Order applicable to any Seller; (iii) require the consent, notice or other action by any Person under, conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of acceleration, termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of the Assigned Contracts or any Acquired Asset, except as would not reasonably be expected to be material in the good faith discretion of Purchaser or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets. No consent, approval, Permit, Order, declaration or filing with, or notice to, any Governmental Body is required

10

by or with respect to any Seller in connection with the execution and delivery of this Agreement and the consummation of the Transaction, except for the requisite Bankruptcy Court approvals.

**Section 3.4    Material Contracts**. Section 3.4 of the Disclosure Schedules lists, as of the date of this Agreement, each of the Assigned Contracts of the types set forth immediately below and any and all amendments, extensions, or other modifications thereof to which any Seller is a party or is bound to the extent covering, attributable to or relating to the conduct of the Sustainable Products Group, any of the Acquired Assets or to which an Acquired Asset is subject to or bound (such Assigned Contracts, which for the avoidance of doubt shall not include any Excluded Assets or the Excluded Liabilities, being the "Material Contracts"):

(a)    Any Assigned Contract that is reasonably expected to result in aggregate payments by or to a Seller in excess of $100,000 in the current or any future calendar year after the Closing (other than Assigned Contracts (i) to sell any Inventory or obsolete equipment sales in the Ordinary Course or (ii) for professional service fees or fees related to furtherance of the pursuing of the transactions contemplated by this Agreement or the Bankruptcy Cases) and cannot be terminated by the Seller party thereto upon notice of 30 days or less;

(b)    Any Assigned Contract to sell or otherwise dispose of any Sellers' interests in any of the Acquired Assets;

(c)    Any Assigned Contract containing any preferential purchase rights, rights of purchase, rights of first offer, right of first refusal or other similar rights affecting any of the Acquired Assets;

(d)    Any Assigned Contract that is an indenture, mortgage, loan, credit agreement, sale-leaseback, guaranty of financial obligation, bond, letter of credit or similar financial Contract the obligations under which are secured by an Encumbrance on any Acquired Asset created by, through or under Sellers;

(e)    Any lease, rental or occupancy agreement, license, installment and conditional sale agreement or other Assigned Contract affecting the ownership of, leasing of, title to, use of or any leasehold or any other interest in any real property;

(f)    Any Assigned Contract entered into since January 1, 2025 pursuant to which any Seller has agreed to acquire any business entity or material assets (including with respect to any equity purchase, merger or business combination) from any third party.

(g)    Any Assigned Contract that is a settlement, conciliation or similar agreement with any Person (including a Governmental Body) which will be binding on the Acquired Assets after the Closing.

The Material Contracts are in full force and effect and are valid and binding obligations of the applicable Seller party thereto and, to the Knowledge of Sellers, each other party thereto, except as would not have an adverse effect on the Seller party thereto. No Seller nor, to the Knowledge of Sellers, any other party to any such Material Contract is in breach of or default, or with the giving of notice, would be in breach or default, with respect to any of its material obligations

11

thereunder except to the extent that such breaches or defaults do not constitute a Material Adverse Effect. Sellers have Made Available all Assigned Contracts that (i) provide for exclusive dealings, rights of first offer, rights of first refusal, "most favored nation" or similar terms in favor of any Person and (ii) contain any covenant of a Seller that limits or purports to limit such Seller's ability or freedom to compete or engage in any line of business, market, jurisdiction or geographic area or to compete with any Person, in each case, to the extent binding on Purchaser or the Acquired Assets following the Closing.

**Section 3.5** **Title to Acquired Assets**. Except pursuant to the Bankruptcy Code or an order of the Bankruptcy Court, no Acquired Asset is subject to any Claim or Order that restricts in any manner the use, transfer, sale or licensing thereof, and no Affiliate of any Seller or any other third party has any ownership interest in any of the Acquired Assets (other than those in which a Seller holds a leasehold interest). Sellers have, and at Closing, will transfer, convey and assign, good and valid title to, or a valid leasehold interest in, all of the Acquired Assets except as set forth on Section 3.5 of the Disclosure Schedules and subject to all associated Permitted Encumbrances, and Sellers are in possession or control of the Acquired Assets. The Sale Order shall provide that all of such Acquired Assets (including leasehold interests) will be transferred to Purchaser free and clear of Encumbrances except for Permitted Encumbrances.

**Section 3.6** **[reserved]**

**Section 3.7** **Assigned Contracts**. True and complete copies of the Assigned Contracts as of the Execution Date have been Made Available. Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller(s) of the applicable Assigned Contracts in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs, Assumed Credits and Assigned Accounts Payable) and except as a result of the commencement of the Bankruptcy Cases, to the Knowledge of Sellers and except for Permitted Encumbrances and as described on Section 3.7 of the Disclosure Schedules as of the Execution Date, (a) the Assigned Contracts are valid and binding on the applicable Seller and each other party thereto, and are in full force and effect, subject to the Enforceability Exceptions; (b) as of two (2) Business Days prior to the Execution Date, such Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, the relevant Assigned Contract; and (c) there are no material disputes pending or threatened under any Contract included in the Acquired Assets.

**Section 3.8** **Permits**. Section 1.1(g) of the Disclosure Schedules sets forth all material Permits held by Sellers for the Acquired Assets. Except as described in Section 3.8 of the Disclosure Schedules and except those Permits held by third parties, other than in connection with or as a result of the Bankruptcy Cases, as of the date of this Agreement, there are no actions pending or, to the Knowledge of Sellers, threatened in writing, that seek the revocation, cancellation or modification of any material Governmental Authorizations, licenses, permits, certificates, approvals or Orders necessary for the lawful ownership and present use of the Acquired Assets (collectively, the "Permits"). There are no Permits that cover both any Acquired Asset, on the one hand, and any Excluded Asset, on the other hand.

**Section 3.9** **Compliance with Laws**. To the Knowledge of Sellers, each Seller and each of their Subsidiaries is in material compliance and since January 1, 2024, has been in material compliance with, all applicable Laws and Orders relating to the Acquired Assets and the Assumed

12

110009169.3

Liabilities, except as set forth in Section 3.9 of the Disclosure Schedules. Except as set forth in Section 3.9 of the Disclosure Schedules, none of the Sellers nor any of their Subsidiaries has received any written notice since January 1, 2023, from a Governmental Body that alleges that such Seller or such Subsidiary is not in compliance with any Law or Order in connection with the operation and use of the Acquired Assets.

**Section 3.10   Legal Proceedings; Orders.**

(a)      Other than as set forth in Section 3.10(a) of the Disclosure Schedules or in connection with or as a result of the Bankruptcy Cases, there are no Claims pending or, to the Knowledge of Sellers, threatened in writing against or by Sellers relating to or affecting the Acquired Assets or the Assumed Liabilities.

(b)      Except for Orders of the Bankruptcy Court, there are no outstanding Orders and, to the Knowledge of Sellers, no unsatisfied judgments, penalties or awards against, relating to or affecting the Acquired Assets.

**Section 3.11   [reserved]**

**Section 3.12   [reserved]**

**Section 3.13   Related Party Transactions.**  Except as set forth on Section 3.13 of the Disclosure Schedules, there are no Contracts or other arrangements in which Sellers, their Affiliates, or any of their respective directors, officers, or employees or any immediate family members thereof is a party, has a financial interest, or otherwise owns or leases any Acquired Asset.

**Section 3.14   Brokers.**  Except as set forth on Section 3.14 of the Disclosure Schedules, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions, in each case based upon arrangements made by or on behalf of a Seller or any of its Subsidiaries.

**Section 3.15   [reserved]**

**Section 3.16   Acquired Assets.**  No assets associated with or related to the Sustainable Products Group have been used in the operation or conduct of the business of any of the Sellers or the Assigned Contracts, and, as of the Execution Date, Sellers have not received any sales, revenue or license fees pertaining to the Sustainable Products Group from any counterparty to an Assigned Contract. Other than proprietary designs, to Sellers' Knowledge there are only two patents and one patent pending, and the related international registrations/filings of such patents and patent pending, associated with the Sustainable Products Group.

**Section 3.17   Environmental Matters.**  Except as set forth on Section 3.17 of the Disclosure Schedules:

(a)      The Acquired Assets are not subject to any order, decree or judgments issued against Sellers by a Governmental Body, in each case, in existence as of the

13

Execution Date and based on any Environmental Laws that presently require any remedial or other corrective action or operating restrictions.

(b)     The Acquired Assets are in compliance with all Environmental Laws in all material respects, and such compliance includes obtaining, maintaining, renewing, and complying in all material respects with the terms and conditions of all material Environmental Permits necessary for the operation of the Acquired Assets by Sellers as presently conducted, and no such Environmental Permits are currently subject to any adverse modification, to the Knowledge of Sellers.  No Seller has received any written notice from any Governmental Body alleging any material violation of or material liability under Environmental Laws with respect to the Acquired Assets, and there are no Actions (including any Environmental Claims) pending, or to the Knowledge of Sellers, threatened, alleging or relating to any alleged material violation of or liability under Environmental Laws with respect to the Acquired Assets that has not been resolved to the satisfaction of the applicable Governmental Body and which would reasonably be expected to result in a material Liability.

(c)     There has been no Release of Hazardous Substances at, to or from the Acquired Assets in violation of Environmental Laws that has not been resolved to the satisfaction of the applicable Governmental Body and which would reasonably be expected to result in a material Liability.  To the Knowledge of Sellers no Hazardous Substances are present, or have been used, handled, managed, stored, generated, transported, processed, treated, disposed of, on, in, from, under or in connection with the Acquired Assets that, in each case, would reasonably be expected to result in a material Liability under Environmental Law for which Purchaser would be responsible.

(d)     True, complete, and correct copies of all material reports, studies, audits, inspections or other documents addressing environmental conditions, health or safety at the Acquired Assets that would reasonably be expected to result in a material Environmental Claim that are in Sellers' possession have been Made Available.

(e)     The representations and warranties set forth in this Section 3.17 constitute the sole and exclusive representation and warranties made by Sellers with respect to matters related to Environmental Matters in connection with the Transactions and the Acquired Assets, and no other provision of this Agreement shall be deemed to address or include such matters.

**Section 3.18   Intellectual Property.**  The consummation of the Transactions shall not adversely affect, diminish, or terminate any Assigned Intellectual Property rights included in the Assigned Intellectual Property, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of Sellers, upon entry of the Sale Order, all items of Assigned Intellectual Property are fully transferable and assignable by Sellers without restriction and without payment of any kind to any Person.  To the Knowledge of Sellers, no current or former partner, director, officer, or employee of Sellers or any of their Affiliates will, after giving effect to the Transactions, own or retain any ownership rights in or to, or have the right to receive any royalty or other payment with respect to, any of the Assigned Intellectual Property.  To the Knowledge of Sellers, there are no pending suits, actions, claims,

14

proceedings or investigations alleging that Sellers are infringing, misappropriating, diluting or otherwise violating any Intellectual Property of a third party or that seek to limit or challenge the validity, enforceability, ownership or use of the Assigned Intellectual Property. To the Knowledge of Sellers, there are no outstanding written claims or "cease and desist" letters received by Sellers alleging that Sellers are infringing, misappropriating, diluting or otherwise violating any Intellectual Property of a third party. To the Knowledge of Sellers, the Sustainable Products Group does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any third party. To the Knowledge of Sellers, no third party is currently engaging in any activity or business that infringes upon, dilutes, or otherwise violates the Assigned Intellectual Property. The representations and warranties set forth in this Section 3.18 constitute the sole and exclusive representation and warranties made by Sellers with respect to matters related to Intellectual Property in connection with the Transactions and the Acquired Assets, and no other provision of this Agreement shall be deemed to address or include such matters.

**Section 3.19   [reserved]**

**Section 3.20   Taxes.** Except as set forth on Section 3.20 of the Disclosure Schedules, (a) all material Tax Returns required to be filed with respect to Non-Income Taxes have been timely (taking into account valid extensions of time to file) and properly filed, each such Tax Return is true, correct and complete in all material respects and all material Non-Income Taxes that have become due and payable have been properly paid in full, (b) there are no Encumbrances (other than Permitted Encumbrances) on any of the Acquired Assets attributable to any unpaid Taxes, (c) there is not currently in effect any extension or waiver of any statute of limitations in any jurisdiction regarding the assessment or collection of any Non-Income Taxes, and (d) no audit, administrative, judicial or other proceeding with respect to Non-Income Taxes has been commenced by any Governmental Body or is presently pending, and no Seller has received written notice of any pending Claim against it (which remains outstanding) from any applicable Governmental Body for assessment of Non-Income Taxes and, to the Knowledge of Sellers, no such Claim has been threatened. The representations and warranties set forth in this Section 3.20 constitute the sole and exclusive representation and warranties made by Sellers with respect to matters related to Taxes in connection with the Transactions and the Acquired Assets, and no other provision of this Agreement shall be deemed to address or include such matters.

**Section 3.21   No Other Representations or Warranties.** Except for the representations and warranties expressly contained in this Article III (as qualified by the Disclosure Schedules) (the "Sellers Express Representations"), neither such Seller nor any other Person on behalf of such Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to such Seller, its businesses, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials) or in that certain virtual data room administered by the Sellers in connection with the Transactions (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors by or on behalf of such Seller or any of its Affiliates or Advisors. Without limiting the foregoing, neither such Seller nor any of its Advisors nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such

110009169.3

information, including any information presentation, any information, statements, disclosures, documents, projections, forecasts or other material Made Available in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information, except for the Sellers Express Representations; *provided*, that nothing herein shall preclude or limit claims for Fraud. Purchaser acknowledges and agrees that the Acquired Assets are sold pursuant hereto strictly "AS IS, WHERE IS, WITH ALL FAULTS", subject only to the Sale Order and the Sellers Express Representations. Sellers acknowledge and agree to Section 4.7.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to the Sellers as follows.

**Section 4.1    Organization and Qualification.** Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Texas and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence, as applicable) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

**Section 4.2    Authorization of Agreement.** Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

**Section 4.3    Conflicts; Consents.** Assuming that (a) the Sale Order and all other requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, permits or consents set forth in Section 4.3 of the Disclosure Schedules are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's organizational documents, (ii) violate any Law or Order applicable to Purchaser, (iii)

16

110009169.3

violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, except, in the case of clauses (i) through (iii), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.  No consent, approval, Permit, Order, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Purchaser in connection with the execution and delivery of this Agreement and the consummation of the Transaction.

**Section 4.4**    **Sufficient Funds**.

(a)    As of the Execution Date, Purchaser has sufficient funds committed to it or available, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions.  Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Acquired Assets and the related Assumed Liabilities. Purchaser acknowledges and agrees that its obligations under this Agreement are not subject to any conditions regarding its ability to obtain financing for all or any portion of the Purchase Price.

(b)    Upon the consummation of the Transactions, (i) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) Purchaser will not be left with unreasonably small capital, (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature and (iv) the capital of Purchaser will not be impaired.

**Section 4.5**    **No Litigation**.  There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will or would be reasonably likely to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the Transactions or Purchaser's performance of its obligations or covenants under this Agreement or the other Transaction Agreements to which it is a party or that would, individually or in the aggregate, reasonably be expected to delay the Closing.

**Section 4.6**    **Brokers**.  Except as set forth on Section 4.6 of the Disclosure Schedules, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions, in each case based upon arrangements made by or on behalf of Purchaser or any of its Subsidiaries.

**Section 4.7**    **No Additional Representations or Warranties**.    Except for the representations and warranties contained in this Article IV, the Sellers are not relying on and will not rely on the accuracy or completeness of any other express or implied representation or warranty

17

with respect to Purchaser or with respect to any other information provided to the Sellers by Purchaser and acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Sellers by Purchaser. Purchaser acknowledges and agrees to Section 3.21.

**Section 4.8     No Outside Reliance.** Notwithstanding anything contained in this Section 4.8 or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Sellers Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that the Acquired Assets are being acquired by Purchaser strictly "AS IS, WHERE IS, WITH ALL FAULTS", subject only to the Sale Order and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Sellers Express Representations), including in any information presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of any Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future businesses, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Acquired Assets, or the quality, quantity or condition of any such asset, (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business associated with the Acquired Assets, including its results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of its independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, any information presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material Made Available in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Sellers Express Representations (it being understood that Purchaser has relied only on the Sellers Express Representations).

## ARTICLE V
## COVENANTS AND AGREEMENTS

**Section 5.1     Conduct of the Sellers.** Except (a) as required by applicable Law, Order or a Governmental Body or any Permit, Contract or Benefit Plan, (b) for any limitations or changes on operations imposed by the Bankruptcy Court (via Order or otherwise) or the Bankruptcy Code (which shall be deemed to include any action or inaction that is prohibited pursuant to the DIP

18

I10009169.3

Order), (c) as expressly contemplated, required or permitted by this Agreement, (d) to the extent related solely to an Excluded Asset or an Excluded Liability or (e) required in response to an Emergency, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), the Sellers shall (i) use commercially reasonable efforts to operate and use the Acquired Assets and manage the Assumed Liabilities in the Ordinary Course subject to reasonable wear and tear, (ii) use commercially reasonable efforts to maintain and preserve intact the Acquired Assets, and (iii) without limiting the generality of the foregoing, from the date of this Agreement until the Closing Date, Sellers shall:

(a) use commercially reasonable efforts to preserve and maintain all Permits required for the ownership and use of the Acquired Assets;

(b) pay the post-petition debts and other obligations of the Sellers when due, subject to and in accordance with the Approved Budget;

(c) [reserved];

(d) give written notice to Purchaser as soon as is practicable of any material damage, casualty, destruction, or condemnation of any Acquired Assets of which Sellers have Knowledge;

(e) maintain insurance coverage on the Acquired Assets in substantially the amounts and types currently in force in all material respects;

(f) [reserved];

(g) maintain the Acquired Assets in the Ordinary Course, subject to reasonable wear and tear;

(h) maintain the Books and Records in the Ordinary Course;

(i) comply in all material respects with all Laws applicable to the ownership and use of the Acquired Assets;

(j) [reserved];

(k) not cause the incurrence, assumption or guarantee by Sellers of any Indebtedness for borrowed money (which, for the avoidance of doubt, shall not include trade accounts payable and any other accounts payable or accrued expenses incurred in the Ordinary Course), other than the delayed draw under the DIP Facility;

(l) not sell, lease, transfer or assign to any Person any of the Acquired Assets or otherwise divest or relinquish any right or assets;

(m) other than non-renewals of month-to-month arrangements pursuant to the terms of service contracts, purchase orders, service orders, schedules, work orders or

19

similar agreements issued under Assigned Contracts, not cause the acceleration, termination, material modification or amendment to or cancellation of any Assigned Contract or Permit;

(n)    [reserved];

(o)    [reserved];

(p)    [reserved];

(q)    not enter into any Material Contract (other than service contracts, purchase orders, service orders, schedules, work orders or similar agreements issued under Assigned Contracts, including under any master services agreement or similar agreement, entered into in the Ordinary Course and on market terms and conditions but without limitation of Section 5.1(u) below) that if entered into prior to the date of this Agreement would be required to be listed in Section 3.4 of the Disclosure Schedules, other than Contracts entered into in connection with the Bankruptcy Cases including any in connection with an Alternate Transaction;

(r)    not amend or adversely modify in any material respect or terminate any Permits held by Sellers and required for the operation of the Acquired Assets as presently conducted;

(s)    not, to the extent any of the following could reasonably be expected to have the effect of increasing the Non-Income Tax liability of Purchaser for any period after the Closing Date, (A) make any settlement of or compromise any Non-Income Tax liability with respect to the Acquired Assets, (B) change any Non-Income Tax election or Non-Income Tax method of accounting with respect to the Acquired Assets; (C) surrender any right to claim a refund of Non-Income Taxes with respect to the Acquired Assets; or (D) consent to any extension or waiver of the limitation period applicable to any Non-Income Tax claim or assessment with respect to the Acquired Assets;

(t)    not settle any suit or litigation or waive any material claims related to or that would be binding on the Acquired Assets following the Closing;

(u)    not incur or commit to any capital expenditure with respect to the Acquired Assets;

(v)    [reserved];

(w)    not seek nor support the approval of any Order by the Bankruptcy Court that could reasonably be expected to result in a Material Adverse Effect; or

(x)    not agree, whether in writing or otherwise, to do anything prohibited by Section 5.1, or not take or permit any action that, or not omit or permit the omission of any action where such omission, would result in anything prohibited by Section 5.1.

20

**Section 5.2    Competing Bids**. This Agreement and the Transactions are subject to the Sellers' right and ability to consider higher or better competing bids with respect to the Acquired Assets pursuant to the bidding procedures, as approved by the Bidding Procedures Order.  In accordance with the Bidding Procedures Order, until the conclusion of the auction, the Sellers shall have the right to, and may cause their Representatives and Affiliates to: (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

**Section 5.3    Bankruptcy Matters**.

(a)    The Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order and the Bidding Procedures Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and, with respect to the Sale Order, a finding of adequate assurance of future performance by Purchaser of the Assigned Contracts, including furnishing witness(es) to testify, affidavits or other documents, or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  The Sellers shall consult with Purchaser and its Representatives concerning any Order of the Bankruptcy Court relating to this Agreement (solely to the extent such Order is reasonably expected to materially impact any of the Acquired Assets, this Agreement or the Transactions) and use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, proposed Orders and other material documents relating to proceedings concerning any such Orders as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court; provided, however, that such obligation of the Sellers shall terminate upon the Closing except to the extent any such proceeding or related document is directly related to this Agreement or the Transactions.  If any Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such Order), the Sellers shall diligently defend against such appeal, petition or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motions, provided that the Sellers shall consult with Purchaser regarding the status of any such actions.

(b)    The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith"

21

110009169.3

buyer within the meaning of Section 363(m) of the Bankruptcy Code, (d) find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code, (e) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (f) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (g) find that Purchaser shall have no Liability for any Excluded Liabilities.

**Section 5.4    Permits and Governmental Approvals Cooperation**. Each Party shall use commercially reasonable efforts to transfer or obtain all Permits (or exemptions therefrom), if any, necessary or required to allow such Party to perform its obligations under this Agreement and each Party shall assist and cooperate with the other Parties and their respective Representatives (at no cost to the assisting Party) in obtaining transfer of all Permits and all Governmental Authorizations that are necessary or appropriate in connection with and in the preparation, execution and submission of any document or other material which may be required by a Governmental Body as a predicate to or as a result of the Transactions. Notwithstanding the foregoing, this Section 5.4 shall not apply to any Governmental Authorizations covered by Section 5.10.

**Section 5.5    Efforts to Closing; Access; Further Assurances; Transition Services**.

(a)    Subject to the terms and conditions of this Agreement and any relevant Orders of the Bankruptcy Court, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of Purchaser and the Sellers shall use their commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions.

(b)    Sellers shall, no later than two (2) Business Days prior to the Closing Date, deliver a copy of the Disclosure Schedules to Purchaser, which copy shall be substantially complete in all respects and substantially the same as the Disclosure Schedules delivered on the Execution Date, with the only changes or additions thereto being such changes or additions as are properly effected pursuant to **Section 5.7(b). The Disclosure Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

(c)    From the date the Deposit is paid by Purchaser to the Escrow Agent in accordance with Section 2.2 until the Closing, Sellers shall (i) afford Purchaser and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Sustainable Products Group that are Acquired Assets (in each case, subject to any permissions of any Person reasonably advisable or required for Purchaser to gain access to third party operated Acquired Assets or Acquired Assets located on the property of a third

22

party to inspect the condition of the same), during ordinary business hours and upon reasonable prior notice and in compliance with all applicable Law and, if applicable, in accordance with any confidentiality agreement; (ii) furnish Purchaser and its Representatives with such financial, operating and other data and information related to the Acquired Assets as Purchaser or any of its Representatives may reasonably request; and (iii) instruct the Representatives of Sellers to cooperate reasonably with Purchaser in its investigation of the Sustainable Products Group; *provided, however*, that Purchaser shall not, without Sellers' prior written consent, conduct or arrange any communications with any supplier, vendor, customer, employee, agent or other Representative of Sellers, and, if such communication is permitted by Sellers, the Sellers shall have the right to have a Representative present for such communication with such supplier, vendor, customer, employee, agent or other Representative of Sellers and none of the Sellers shall be required to provide access or furnish, nor shall Purchaser or its Representatives have any right to inspect or investigate, any Excluded Books and Records in connection therewith. Any investigation pursuant to this Section 5.5 shall be conducted in such manner as not to interfere unreasonably with the conduct of the businesses of Sellers. No investigation by Purchaser or other information received by Purchaser shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement.

(d)     From time to time, on or after the Closing Date, the Sellers shall execute and deliver such other instruments of transfer to Purchaser as are reasonably necessary and as Purchaser may reasonably request in order to more effectively vest in Purchaser all of the Sellers' right, title and interest to the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(e)     After the Closing, Sellers shall, at Purchaser's sole cost and expense (including reimbursement of any of Sellers' out-of-pocket costs and expenses), promptly provide reasonable cooperation, assistance, and support as reasonably requested in writing by Purchaser and as reasonably necessary to effectuate the transfer of the Acquired Assets and the transition of the ownership, use, and operation of the Acquired Assets to Purchaser. Such cooperation shall include using commercially reasonable efforts to facilitate the orderly transfer of Books and Records, Personal Property, information technology assets, data (in native and reasonably usable electronic formats), passwords, access credentials, vendor, contractor, customer and service provider information, and other materials, in each case to the extent they comprise Acquired Assets and such information is not reasonably available to Purchaser. Subject to Purchaser's requests being reasonable and Purchaser's timely payment of costs and expenses to Sellers, Sellers shall use commercially reasonable efforts to facilitate the transition of the Acquired Assets and shall not intentionally take, or knowingly fail to take, any action intended to impair or delay such transition. Sellers shall not be obligated to hire or retain employees in connection with complying with this Section 5.5(e).

(f)     Nothing in this Section 5.5 or otherwise in this Agreement shall (i) require any Party to make any expenditure or incur any obligation not otherwise required or provided for under this Agreement or (ii) prohibit any Seller from ceasing operations or winding up its affairs.

23

110009169.3

**Section 5.6    Notice of Certain Events.**

(a)    From the date of this Agreement until the Closing, Sellers shall promptly notify Purchaser in writing of:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Sellers hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 6.1 to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(iii)    any notice or other communication from any Governmental Body in connection with the Transactions; and

(iv)    any Claims commenced or, to the Knowledge of Sellers, threatened against, relating to or involving or otherwise affecting the Sustainable Products Group, the Acquired Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.10 or that relates to the consummation of the Transactions.

(b)    Purchaser's receipt of information pursuant to this Section 5.6 shall not operate as a waiver or otherwise affect any representation, warranty, covenant or agreement given or made by Sellers in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 5.7    Tax Matters.**

(a)    Purchaser shall bear and pay (i) any sales, use, purchase, transfer, deed, fixed asset, stamp, documentary registration, value added, excise or other similar Taxes incurred or imposed with respect to the transactions described in this Agreement (collectively, the "Transfer Taxes") and (ii) required filing and recording fees and expenses in connection with the filing and recording of the assignments, conveyances, or other instruments required to convey title to the Acquired Assets to Purchaser. Except to the extent otherwise required by Law, Purchaser shall, at its own expense, timely file all Tax Returns and other documentation related to any Transfer Taxes. Purchaser and the Sellers will cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any such Transfer Taxes.

(b)    As of the Closing Date, Section 5.7(b) of the Disclosure Schedule shall set forth an allocation (the "Allocation") of the Purchase Price (and any other items properly treated as consideration for U.S. federal income Tax purposes), among the Acquired Assets in accordance with Section 1060 of the Tax Code and the applicable Treasury Regulations

24

promulgated thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate).  Purchaser and Sellers shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

(c)     The Purchaser and the Sellers shall cooperate in good faith, as and to the extent reasonably requested by any other Party, in connection with any Tax matters related to the Acquired Assets, including the preparation, filing and execution of Tax Returns, and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon a Party's reasonable request) the provision of records and information that are reasonably relevant to any such Tax Return or audit, litigation or other proceeding and making employees available (as reasonably requested) on a mutually convenient basis to provide additional information and explanation of any materials provided under this Agreement.  Purchaser agrees to retain all books and records with respect to Tax matters pertinent to the Acquired Assets relating to any Tax period beginning before the Closing Date until the expiration of the statute of limitations of the respective taxable periods and to abide by all record retention agreements entered into with any Governmental Body.

**Section 5.8     [reserved]**

**Section 5.9     Confidentiality**.  From and after the Closing the confidential information and trade secrets included in the Acquired Assets ("Business Confidential Information") will be the confidential information of Purchaser.  Sellers will not use the Business Confidential Information for any reason (except to the extent permitted pursuant to the immediately following sentence).  From and after the Closing, Sellers agree to keep confidential and not disclose the Business Confidential Information, except to the extent that (i) Purchaser shall have provided its prior written consent, (ii) such information has otherwise been made public by Purchaser (other than as required in connection with the Bankruptcy Cases), or (iii) Sellers are required by applicable Law (including, in connection with the Bankruptcy Cases) to divulge or disclose any such information (in which case Sellers shall promptly notify Purchaser, to the extent legally permitted, in advance of disclosing such information and use commercially reasonable efforts to cooperate with Purchaser to limit such disclosure, to the extent permitted under applicable Law).

**Section 5.10    Governmental Approvals and Consents**.

(a)     Sellers shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 3.3 of the Disclosure Schedules.

(b)     Without limiting the generality of the Parties' undertakings pursuant to subsections (a) and (b) above, each Party shall use reasonable best efforts to:

(i)     respond to any inquiries by any Governmental Body regarding antitrust or other matters with respect to the Transactions;

(ii)     avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the Transactions; and

(iii)     in the event any Order adversely affecting the ability of the Parties to consummate the Transactions has been issued, to have such Order vacated or lifted.

(c)     All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either Party before any Governmental Body or the staff or regulators of any Governmental Body, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Sellers or Purchaser with any Governmental Body in the Ordinary Course, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other Party hereunder in advance of any filing, submission or attendance, it being the intent that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals.  Each Party shall give notice to the other Party with respect to any meeting, discussion, appearance or contact with any Governmental Body or the staff or regulators of any Governmental Body, with such notice being sufficient to provide the other Party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

**Section 5.11   Public Announcement**.  Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), including in connection with the Bankruptcy Cases, no Party shall make any public announcements in respect of this Agreement or the Transactions or otherwise communicate with any news media without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.12   Receipt of Misdirected Assets; Liabilities**.

(a)     From and after the Closing, if Sellers or any of their respective Affiliates receives, or Purchaser identifies, any right, property or asset that is an Acquired Asset, Sellers shall promptly transfer or cause such of their Affiliates to transfer such property, right, interest or other tangible or intangible asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Sellers for Purchaser until so transferred.  From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Sellers, and such asset will be deemed the property of Sellers held in trust by Purchaser for Sellers until so transferred.

(b)     From and after the Closing, if Sellers or any of their Affiliates are subject to a Liability that is an Assumed Liability that should belong to Purchaser or its Affiliates

26

110009169.3

pursuant to the terms of this Agreement, Sellers shall promptly transfer or cause such of their Affiliates to transfer such Assumed Liability to Purchaser, and Purchaser shall assume and accept such Assumed Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that is an Excluded Liability that should belong to Sellers or their Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Excluded Liability to Sellers or their Affiliates, and Sellers or their Affiliates shall assume and accept such Excluded Liability.

(c)     The Sale Order shall provide that no Person may assert any set off, recoupment, or similar claims against Purchaser or the Acquired Assets based on any Claims against Sellers or their Affiliates, and that all Claims are channeled exclusively to the proceeds of sale.

**Section 5.13   Satisfaction of Postpetition Liabilities**. Sellers shall pay, or set aside sufficient funds to pay or satisfy, as applicable, all of the following unpaid, or unsatisfied, Liabilities of Sellers, other than Assumed Liabilities, incurred in the Ordinary Course and in accordance with the Approved Budget between the date of the filing of the Bankruptcy Case and the Closing (whether due prior to, on, or after the Closing): (i) payroll, employment benefits, and any other related Liabilities in respect of the Employees and (ii) all post-petition accounts payable that are not Assigned Accounts Payable.

**Section 5.14   No Successor Liability**. The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (a) be the successor of Sellers, (b) have, de facto, or otherwise, merged with or into any Seller, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than Permitted Encumbrances to the extent, but only to the extent, to which any Acquired Asset is subject), and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the business of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions consistent with, but not limited by, this Section 5.14.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.1     Conditions Precedent to the Obligations of Purchaser and the Sellers**. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

27

110009169.3

(a)     no court of competent jurisdiction or other Governmental Body shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions or causing the Transactions to be rescinded following completion thereof, in each case that is still in effect;

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order; and

(c)     all approvals required to be obtained from any Governmental Body shall have been obtained.

**Section 6.2     Conditions to Obligations of Purchaser**. The obligations of Purchaser to consummate the Transactions shall be subject to the fulfillment or Purchaser's written waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the Fundamental Sellers Representations, the representations and warranties of Sellers contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "in any material respect," "material," or "materially") on and as of the Closing with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), in each case, except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Fundamental Sellers Representations shall be true and correct in all respects, other than *de minimis* inaccuracies, on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Sellers shall have duly performed and complied in all material respects with all covenants and obligations required by this Agreement to be performed or complied with by it as of or prior to the Closing Date, including Section 2.4.

(c)     All notices that are listed on Section 3.3 of the Disclosure Schedules shall have been delivered as promptly as practicable following the date of this Agreement, and in any event prior to the earlier of the Closing and the date on which notice is required to be delivered under the applicable Contract, to each Person who has a right to receive notice in connection with the Transactions, which notices shall be in a form reasonably satisfactory to Purchaser.

(d)     The Sale Order shall be in form and substance reasonably satisfactory to the Purchaser and all objections to the sale shall have been overruled or resolved in a manner reasonably satisfactory to the Purchaser, including Section 2.1 and Section 2.5.

28

**Section 6.3    Conditions to Obligations of Sellers**.   The obligations of Sellers to consummate the Transactions shall be subject to the fulfillment or Sellers' written waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the Fundamental Purchaser Representations, the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "in any material respect," "material," or "materially") on and as of the Closing with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), in each case, except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.   The Fundamental Purchaser Representations shall be true and correct in all respects, other than *de minimis* inaccuracies, on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)    Purchaser shall have duly performed and complied in all material respects with all covenants and obligations required by this Agreement to be performed or complied with by it as of or prior to the Closing Date, including Section 2.5.

**Section 6.4    Waiver of Conditions**.   Upon the occurrence of the Closing, any condition set forth in this Article VI that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.   None of Purchaser or the Sellers may rely on the failure of any condition set forth in this Article VI, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

**ARTICLE VII**
**TERMINATION**

**Section 7.1    Termination of Agreement**.   This Agreement may be terminated at any time prior to the Closing only in accordance with this Section 7.1:

(a)    by the mutual written consent of the Sellers and Purchaser;

(b)    by written notice of either Purchaser or the Sellers, upon the issuance of a Final Order restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, provided that no Party may terminate this Agreement under this Section 7.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or the Sellers, if the Closing shall not have occurred on or before the date that is seventy-five (75) days after the Petition Date (the "Outside Date"), provided that a Party shall not be permitted to terminate this

29

I10009169.3

Agreement pursuant to this <u>Section 7.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)      by either Purchaser or the Sellers, if, following the Sale Hearing, Purchaser is not the "Winning Bidder" or the "Back-Up Bidder" (as such terms are defined in the Bidding Procedures attached as an exhibit to the Bidding Procedures Order of the Bankruptcy Court);

(e)      by Purchaser, if the Bankruptcy Court does not enter the Sale Order within fifteen (15) Business Days of the conclusion of the Sale Hearing;

(f)      by E3 if (i) all of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied, or waived by Purchaser (other than (x) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by E3 to Purchaser, capable of being satisfied if the Closing were to occur at such time and (y) those conditions which have not been satisfied, in whole or in part, as a result of a breach of this Agreement by Purchaser), (ii) E3 has confirmed in writing to Purchaser that all of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied or waived by E3 (other than (x) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by E3 to Purchaser, capable of being satisfied if the Closing were to occur at such time and (y) those conditions which have not been satisfied, in whole or in part, as a result of a breach of this Agreement by Purchaser), (iii) E3 has confirmed in writing to Purchaser that the Sellers are ready, willing and able to effect the Closing and (iv) Purchaser does not consummate the Closing within five (5) Business Days following the receipt by Purchaser of such notice;

(g)      by Purchaser if (i) all of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.3</u> have been satisfied, or waived by Sellers (other than (x) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by Purchaser to E3, capable of being satisfied if the Closing were to occur at such time and (y) those conditions which have not been satisfied, in whole or in part, as a result of a breach of this Agreement by E3), (ii) Purchaser has confirmed in writing to E3 that all of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.3</u> have been satisfied or waived by Purchaser (other than (x) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by Purchaser to E3, capable of being satisfied if the Closing were to occur at such time and (y) those conditions which have not been satisfied, in whole or in part, as a result of a breach of this Agreement by E3), (iii) Purchaser has confirmed in writing to E3 that Purchaser is ready, willing and able to effect the Closing and (iv) Sellers do not consummate the Closing within five (5) Business Days following the receipt by E3 of such notice;

(h)      by Purchaser, if at any time, (A) there has been a material breach by Sellers of this Agreement such that any of the conditions set forth in <u>Section 6.1</u> or <u>Section 6.2</u> are not capable of being satisfied by the Outside Date as a result of such breach or failure and

30

110009169.3

(B) such breach or failure is not cured within twenty (20) days after written notice thereof is provided by Purchaser to Sellers;

(i)     by Sellers, if at any time, (A) there has been a material breach by Purchaser of this Agreement such that any of the conditions set forth in Section 6.1 or Section 6.3 are not capable of being satisfied by the Outside Date as a result of such breach or failure and (B) such breach or failure is not cured within twenty (20) days after written notice thereof is provided by Sellers to Purchaser;

(j)     by Purchaser, if the Bankruptcy Court enters an Order (i) pursuant to Section 362 of the Bankruptcy Code lifting or modifying the automatic stay with respect to any material portion of the Acquired Assets such that the applicable Acquired Assets are no longer available for purchase under this Agreement, or (ii) providing that the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code for any reason prior to the Closing;

(k)     by Purchaser, if the Bidding Procedures Order or the Sale Order is modified in any manner materially adverse to Purchaser without the consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed) and cannot be remedied by Sellers in a manner reasonably acceptable to Purchaser (and such action has not been reversed or vacated within ten (10) Business Days after its occurrence);

(l)     by Purchaser, if the Closing shall not have occurred by the Outside Date.

(m)     Without limiting the foregoing, this Agreement shall terminate automatically and without any further action by Sellers or Purchaser upon, and shall be deemed to have been terminated: (i) if Purchaser is not designated as the "Back-Up Bidder" (as such term is defined in the Bidding Procedures Order attached as an exhibit to the Bidding Procedures Order of the Bankruptcy Court), immediately prior to the earliest to occur of (A) Sellers' entry into a definitive agreement regarding an Alternate Transaction; and (B) the entry of an Order by the Bankruptcy Court approving Sellers' entry into an Alternate Transaction; or (ii) if Purchaser is designated as the "Back-Up Bidder" in accordance with the Bidding Procedures Order, on the "Back-Up Bid Expiration Date" (as such term is defined in the Bidding Procedures Order) (the occurrence of such event in (i) or (ii) of this section, an "Alternate Transaction Termination Event").

**Section 7.2     Effect of Termination.**

(a)     In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement, provided that this Section 7.2 and Section 2.2 shall survive any such termination. If this Agreement is terminated pursuant to Section 7.1 (other than pursuant to Section 7.1(f) or Section 7.1(i) (in which case the Deposit shall be released to the Parties in accordance with Section 2.2), then, within five (5) Business Days of such termination, the Parties shall jointly instruct the Escrow Agent to release the Deposit to Purchaser.

31

110009169.3

## ARTICLE VIII
## SURVIVAL & INDEMNIFICATION

**Section 8.1  Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers.** Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing; provided that the indemnification obligations of Purchaser set forth in Section 8.2 shall survive for six (6) months following the Closing; provided, further, that nothing herein shall preclude or limit claims for Fraud. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms.

**Section 8.2  Purchaser's Indemnification Obligations.** Subject to the terms of this Agreement, from and after the Closing Date, Purchaser shall be responsible for, shall pay, and shall indemnify, defend and hold harmless the Sellers, each Affiliate of the Sellers and each of their respective Representatives (collectively, the "Seller Indemnified Persons") from and against all Liabilities, Actions and claims arising out of, attributable to or resulting from any of the Assumed Liabilities.

**Section 8.3  Indemnification Actions.** All claims for indemnification under this Article VIII shall be asserted and resolved as follows:

(a)  To make a claim for indemnification, defense or reimbursement under this Article VIII, a Seller Indemnified Person shall notify the Purchaser of its claim, including the specific details (including supporting documentation in such Seller Indemnified Person's possession or control of the alleged Liabilities and such Seller Indemnified Person's good faith estimate of the applicable claim) of and specific basis under this Agreement for its claim (the "Claim Notice").

(b)  In the event that any claim for indemnification set forth in any Claim Notice is based upon a claim by a third party (unaffiliated with any Seller, Purchaser or any of their respective Affiliates) against the Seller Indemnified Person (a "Third Party Claim"), the Seller Indemnified Person shall provide its Claim Notice promptly after the Seller Indemnified Person has actual knowledge of the Third Party Claim and shall enclose a copy of all papers (if any) served with respect to the Third Party Claim in such Seller Indemnified Person's possession or control; provided that the failure of any Seller Indemnified Person to give notice of any Third Party Claim as provided in this Section 8.3 shall not relieve the Purchaser of its obligations under this Article VIII except to the extent such failure results in insufficient time being available to permit the Purchaser to effectively defend against the Third Party Claim or otherwise prejudices the Purchaser's ability to defend against the Third Party Claim.

32

I10009169.3

(c)     Subject to Section 8.3(e), in the case of a claim for indemnification based upon any Third Party Claim, the Purchaser shall have thirty (30) days from its receipt of the Claim Notice to notify the Seller Indemnified Person whether it admits or denies its obligation hereunder to defend the Seller Indemnified Person against such Third Party Claim under this Agreement.  The Seller Indemnified Person is authorized, prior to and during such thirty (30) day period, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests and that is not materially prejudicial to Purchaser's interest.  Failure of Purchaser to admit its liability to defend a Seller Indemnified Person within such 30-day period shall be deemed a denial of liability to so defend such Seller Indemnified Person.  If the Purchaser fails to notify the Seller Indemnified Person within such thirty (30) day period regarding whether the Purchaser admits or denies its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, then until such date as the Purchaser admits or it is finally determined by a non-appealable judgment that such right or obligation exists, the Seller Indemnified Person may file any motion, answer or other pleading, settle any Third Party Claim or take any other action that the Seller Indemnified Person deems necessary or appropriate to protect its interest so long as such actions are not materially prejudicial to Purchaser's interest.

(d)     If Purchaser admits its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, as applicable, then Purchaser shall have (i) the right and obligation to diligently prosecute and control the defense of such Third Party Claim at the sole cost and expense of Purchaser and (ii) have full control of such defense and proceedings, including any compromise or settlement thereof unless the compromise or settlement includes the payment of any amount by, the performance of any obligation by, or the limitation of any right or benefit of, the Seller Indemnified Person, in which event such settlement or compromise shall not be effective without the consent of the Seller Indemnified Person, which shall not be unreasonably withheld or delayed.  If requested by the Purchaser, the Seller Indemnified Person agrees at the cost and expense of the Purchaser to cooperate in contesting any Third Party Claim which the Purchaser elects to contest; *provided, however*, that the Seller Indemnified Person shall not be required to bring any counterclaim or cross-complaint against any Person.  The Seller Indemnified Person may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Purchaser pursuant to this Section 8.3(d), *provided*, that the Seller Indemnified Person may file initial pleadings as described in the last sentence of Section 8.3(c) if required by court or procedural rules to do so within the thirty (30) day period in Section 8.3(c).  A Purchaser shall not, without the written consent of the Seller Indemnified Person, settle any Third Party Claim or consent to the entry of any judgment with respect thereto that (A) does not result in a final resolution of the Seller Indemnified Person's liability with respect to the Third Party Claim (including, in the case of a settlement, an unconditional written release of the Seller Indemnified Person from all further liability in respect of such Third Party Claim) or (B) may materially and adversely affect the Seller Indemnified Person (other than as a result of money damages borne solely by Purchaser hereunder).

(e)     If Purchaser does not admit in writing its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement or admits its

33

obligation but thereafter fails to diligently defend or settle the Third Party Claim, as applicable, then the Seller Indemnified Person shall have the right, but not the obligation, to defend and control the defense against the Third Party Claim (at the sole cost and expense of Purchaser if the Seller Indemnified Person is entitled to indemnification hereunder), with counsel of the Seller Indemnified Person's choosing, subject to the right of Purchaser to admit in writing its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, as applicable, at any time prior to settlement or final determination thereof.  If Purchaser has not yet admitted its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, the Seller Indemnified Person shall send written notice to the Purchaser of any proposed settlement and the Purchaser shall have the option for ten (10) days following receipt of such notice to admit in writing its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Article VIII, and if such right or obligation is so admitted, assume the defense of the Third Party Claim, including the power to reject the proposed settlement.

(f)     In the case of a claim for indemnification not based upon a Third Party Claim (a "Direct Claim"), such Direct Claim shall be asserted by giving the Purchaser a reasonably prompt Claim Notice.  Such Claim Notice by the Seller Indemnified Person shall describe the Direct Claim in reasonable detail, shall include copies of all available material written evidence in such Seller Indemnified Person's possession or control thereof and shall indicate the estimated amount, if reasonably practicable, of Liabilities that have been or may be sustained by the Seller Indemnified Person.  Purchaser shall have sixty (60) days from its receipt of the Claim Notice to (i) cure the Liabilities complained of, (ii) admit its obligation to defend the Seller Indemnified Person against such Direct Claim under this Agreement, or (iii) dispute the claim for such Liabilities.  If Purchaser does not notify the Seller Indemnified Person within such sixty (60) day period that it has cured the Liabilities or that it disputes the claim for such Liabilities, the Purchaser shall be deemed to have disputed its obligation to indemnify, defend and hold harmless the Seller Indemnified Person against such Direct Claim under this Agreement.

(g)     Each Seller Indemnified Person is an express third party beneficiary of this Article VIII and shall be entitled to rely on and enforce the terms hereof, along with any other defined terms or provisions of this Agreement necessary to avail itself of the rights granted under this Article VIII.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1    Expenses.**  Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses.

34

110009169.3

**Section 9.2**  **Approval**.  Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order).  Nothing in this Agreement shall require Sellers or their Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**Section 9.3**  **Notices**.  Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

> E4 Energy Services, LLC
> 3944 Marquette
> Dallas, Texas 75225
> Attention:    Robert Stiles
> Email:    robert@stilesnet.com
> with copies to (which shall not constitute notice):

> Polsinelli PC
> 4020 Maple Avenue, Suite 300
> Dallas, TX 75219
> Attention:    Robert Sarfatis
> Email:    rsarfatis@polsinelli.com

Notices to the Sellers:

> Axip Energy Services, LP
> 8150 N. Central Expressway, Suite 775
> Dallas, Texas 75206
> Attention:    Robert Stiles; Sarah Seilheimer
> Email:    rstiles@axip.com; sseilheimer@axip.com

with copies to (which shall not constitute notice):

> Vinson & Elkins, L.L.P.
> 845 Texas Avenue, Suite 4700
> Houston, TX 77002

35

Attention:    Crosby Scofield; Alexander Baker
Email:       cscofield@velaw.com; abaker@velaw.com

**Section 9.4**    **Binding Effect; Assignment**. Subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, this Agreement shall be binding on Purchaser and the Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases, provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated by Sellers without the prior written consent of Purchaser, and any attempted assignment or delegation without such prior written consent shall be null and void. Purchaser may, with reasonable notice to Sellers, assign the Agreement and any of Purchaser's rights and obligations hereunder to a controlled Affiliate or other wholly-owned subsidiary of Purchaser, provided that (a) at the time of such assignment such controlled Affiliate or other wholly-owned subsidiary of Purchaser has the financial wherewithal to fulfill all payment obligations hereunder and (b) no such assignment shall relieve Purchaser of its obligations under this Agreement.

**Section 9.5**    **Amendment and Waiver**. Any provision of this Agreement or the Disclosure Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Sellers or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 9.6**    **Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (a) for purposes of (i) Article VIII, the Seller Indemnified Persons and (ii) Section 9.7, the Non-Recourse Persons and (b) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 9.7**    **Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement, may only be brought against the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, (a) no past, present or future shareholder, member, partner, manager, director, officer, employee, incorporator, Affiliate, agent or Advisor of any Party or such Person's successors or permitted assigns (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any claim, action, suit or legal proceeding based on, in respect of or by reason of the transactions contemplated hereby and (b) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this Section 9.7 and shall be entitled to enforce this Section 9.7 as if a party directly hereto.

36

**Section 9.8** <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

**Section 9.9** <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.

**Section 9.10** <u>Complete Agreement</u>. This Agreement, the Disclosure Schedules, the Non-Solicitation Agreement, the Escrow Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

**Section 9.11** <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of him, her or it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 9.12</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither the Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 9.11</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Sellers pursuant to this <u>Section 9.11</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit the Sellers from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 9.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten (10) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 9.11</u> be used, alone or together with

37

any other provision of this Agreement, to require the Sellers to remedy any breach of any representation or warranty made by the Sellers herein.

**Section 9.12   Jurisdiction and Exclusive Venue.** Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, a Texas Business Court in a Division of the Texas Business Court in which the Party may establish proper venue (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Texas) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 9.13   Governing Law; Waiver of Jury Trial.**

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements executed and performed entirely within such State without regard to conflicts of law principles of the State of Texas or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Texas to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE

110009169.3

IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.13(B).

**Section 9.14   No Right of Set-Off**. Purchaser, on its own behalf and on behalf of its successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser or any of its successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

**Section 9.15   Counterparts and PDF**.   This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument.  Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**Section 9.16   Bulk Sales Laws**. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

**Section 9.17   Sellers' Representative**. Each Seller acknowledges and agrees that E3 has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement.  Such power will include the power to make all decisions, actions, consents and determinations on behalf of the Sellers, including to make any waiver of any closing condition or agree to any amendment to this Agreement, or to manage any indemnification process on behalf of any Seller Indemnified Person.  No Seller shall have any right to object, dissent, protest or otherwise contest the same.  Purchaser shall be entitled to rely on any action or omission taken by E3 on behalf of the Sellers.  Any action taken (or to be taken) by E3 in connection with this Agreement, any Transaction Agreement or the transactions contemplated hereby or thereby shall be deemed to be the action (or obligation) of the Sellers, and for the avoidance of doubt, any breach by E3 of the covenants set forth herein shall be deemed to be a breach of the applicable

39

Seller. No Seller may revoke the authority of the Seller's Representative. Any costs incurred by E3 in its capacity as such shall be paid by the Sellers, collectively. E3 shall not resign until a successor representative shall have been appointed.

## ARTICLE X
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 10.1  Certain Definitions.** For purposes of this Agreement, capitalized terms used in this Agreement but not otherwise defined herein shall have the meanings set forth below.

(a)     "Action" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

(b)     "Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other Representatives of such Person.

(c)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)     "Aged Accounts Receivable" means all Assigned Accounts Receivable, which are more than 90 days past due as of the Closing Date.

(e)     "Alternate Transaction" means (a) one or more transactions in which all or a material portion of the Acquired Assets are sold or conveyed, directly or indirectly, to a buyer or entity other than the Purchaser, including pursuant to a plan of reorganization, (b) a successful credit bid transaction with respect to the Acquired Assets, (c) the consummation of any state court foreclosure action as to a material portion of the Acquired Assets, or (d) a plan of reorganization or liquidation that does not contemplate the sale of the Acquired Assets to the Purchaser in accordance with the terms of this Agreement.

(f)     "Approved Budget" shall have the meaning set forth in the DIP Order.

(g)     "Benefit Plan" means each (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA, (ii) end of service or employment, severance, termination protection, retirement, pension, profit sharing, deferred compensation, equity or equity-based, health or welfare, employment, consulting, independent contractor, vacation, change in control, transaction, retention, bonus or other incentive, fringe benefit, paid time off or similar plan, Contract, arrangement, agreement, program or policy or (iii) other plan, Contract, policy, arrangement or agreement providing

40

110009169.3

compensation or benefits, and in the case of each clause (i) through (iii) whether or not written.

(h)   "Bidding Procedures Order" means the Order (i) Approving (A) Bidding Procedures, (B) Certain Bid Protections in Connection With a Stalking Horse Agreement, if Any, (C) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (D) Assumption and Assignment Procedures; (ii) Scheduling Auction, Sale Hearing, and Related Deadlines; (iii) Approving (A) Sale of Substantially All of Debtors' Assets Free and Clear of Liens (other than Permitted Encumbrances), Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (iv) Granting Related Relief, which shall be in form and substance reasonably acceptable to Purchaser.

(i)   "Business Day" means any day other than a Saturday, Sunday or other day on which banks in Houston, Texas are authorized or required by Law to be closed.

(j)   "Carve-Out" shall have the meaning ascribed to it in the DIP Order.

(k)   "Claim" means all actions, claims, counterclaims, suits, proceedings, demand, lawsuit, arbitration, inquiry, audit, notice of violation, litigation, citation, summons, rights of action, causes of action, Liabilities, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of subpoena, investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

(l)   "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems, or renders unnecessary, the same.

(m)   "Contract" means any written contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, including any purchase order, service contract, service order, schedule, work order or similar document.

(n)   "Credits" means any downtime, availability or other similar credit granted or to be granted to any customer pursuant to any Assigned Contract and accounted for in the aggregate in the accounts receivable balance of the Sellers' balance sheet as of the Closing that results in a dollar for dollar reduction to the Assigned Accounts Receivable balance.

(o)   "DIP Facility" shall have the meaning set forth in the DIP Order.

(p)   "DIP Obligations" shall have the meaning ascribed to it in the DIP Order.

110009169.3

(q)     "DIP Order" means, collectively, as applicable, and from and after entry by the Bankruptcy Court, the interim order or Final Order (i) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Parties, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief.

(r)     "Disclosure Schedules" means the disclosure schedules delivered by the Sellers in accordance with the terms of this Agreement (with specific reference to the representations and warranties in Article III to which the information in such schedule relates).

(s)     "Emergency" means a sudden or unexpected event that causes, or risks causing, (i) substantial damage to all or any portion of the assets or the property of any third party, (ii) imminent death or serious bodily injury to any Person or (iii) imminent damage or substantial risk of damage to natural resources (including wildlife) or the environment.

(t)     "Employees" means all employees of the Sellers that provide services to the Business, including those on disability or a leave of absence, whether paid or unpaid.

(u)     "Encumbrance" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, any adverse interest, community property interest, equitable interest, easement, lease, sublease, license, sublicense, right of first refusal or offer, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(v)     "Environmental Claim" means any affirmative obligation to affect cleanup or remediation under, or resolve noncompliance with, any Environmental Law and any Liability associated with or arising therefrom.

(w)     "Environmental Law" means any applicable Law or any binding agreement with any Governmental Body relating to the protection of occupational or human health and safety (to the extent relating to exposure to Hazardous Substances), the environment (including ambient air, soil, surface water or groundwater, or subsurface strata), protection of natural resources, endangered, threatened or candidate species, biological or cultural resources, the release into the indoor or outdoor environment of pollutants, contaminants, wastes, chemicals, or toxic or other hazardous substances (or the cleanup thereof) or concerning the exposure to, or the Release or remediation of any Hazardous Substances.

(x)     "Environmental Permit" means any Permit issued pursuant to or otherwise required under Environmental Laws.

(y)     "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities

42

110009169.3

(including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(z)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(aa)    "Escrow Agent" means JPMorgan Chase Bank, N.A.

(bb)    "Escrow Agreement" means that certain escrow agreement dated as of the Execution Date, by and among Purchaser, E3 and the Escrow Agent.

(cc)    "Final Order" means (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any of the Bankruptcy Cases (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Bankruptcy Cases (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided, however, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

(dd)    "Fraud" means a Party's intentional and knowingly false representation of material fact set forth in this Agreement or in any certificate delivered pursuant to this Agreement by such Party, made with the Knowledge of Sellers or the Knowledge of Purchaser, as applicable, of such material falsity at the time such representation and warranty was made by such Party and with the specific intent to deceive another Party to this Agreement, upon which such other Party justifiably relied to its actual detriment. For the avoidance of doubt, (a) "Fraud" shall be limited to the representations and warranties expressly set forth in this Agreement and shall not be based on, or include, any extra-contractual statements, projections, forecasts, opinions, diligence materials, or other information; and (b) "Fraud" shall not include equitable fraud, promissory fraud, constructive fraud, negligent misrepresentation, recklessness, or similar theories. In no

43

110009169.3

event shall "Fraud" be imputed to any party based on vicarious, agency, controlling person, or similar secondary liability theories, absent the actual and intentional fraud of the specific individual(s) included in the definitions of Knowledge of Purchaser or Knowledge of Sellers.

(ee)     "Fundamental Purchaser Representations" means the representations and warranties contained in Section 4.1 (*Organization and Qualification*), Section 4.2 (*Authorization of Agreement*), Section 4.3 (*Conflicts; Consents*) and Section 4.6 (*Brokers*).

(ff)     "Fundamental Sellers Representations" means the representations and warranties contained in Section 3.1 (*Organization and Qualification*), Section 3.2 (*Authorization of Agreement*), Section 3.3 (*Conflicts; Consents*), Section 3.5 (*Title to Acquired Assets*) and Section 3.14 (*Brokers*).

(gg)     "GAAP" means generally accepted accounting principles in the United States.

(hh)     "Governmental Authorization" means any permit, license, certificate, approval, consent, waiver, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any applicable Law.

(ii)     "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

(jj)     "Hazardous Substances" means any pollutant, contaminant, waste, chemical, compound, substance or material that is subject to regulation, investigation, control, or remediation pursuant to Environmental Laws, including, without limitation, those classified, regulated, or defined as "toxic," "hazardous," a "hazardous waste," "hazardous substance," or "extremely hazardous substance" under Environmental Laws and including petroleum or petroleum byproducts, asbestos, polychlorinated biphenyls, NORM, and per and polyfluoroalkyl substances.

(kk)     "Income Taxes" means (a) all Taxes based upon, measured by, or calculated with respect to gross or net income, gross or net receipts or profits (including franchise Taxes and any capital gains, alternative minimum, and net worth Taxes, but excluding ad valorem, property, excise, severance, production, sales, use, real or personal property transfer or other similar Taxes), (b) Taxes based upon, measured by, or calculated with respect to multiple bases (including corporate franchise, doing business or occupation Taxes) if one or more of the bases upon which such Tax may be based, measured by, or calculated with respect to is included in clause (a) above or (c) withholding Taxes measured with reference to or as a substitute for any Tax included in clauses (a) or (b) above.

(ll)     "Indebtedness" means, without duplication, all Liabilities, including unpaid principal amounts, accrued or unpaid interest on, and other payment obligations (including

44

any prepayment penalties, premiums, costs, breakage or other amounts payable upon the discharge thereof) arising under: (a) indebtedness for borrowed money or in respect of loans or advances, or obligations in substitution or exchange therefor (including bank term and revolving credit loans and convertible loans), (b) letters of credit, bonds, debentures, notes or similar instruments (including surety, performance or similar type of bonds), (c) subordinated loans, bank bills (acceptance credits), and other indebtedness for borrowed money, (d) all obligations under interest rate or currency swap, forward contract, caps or collar transactions or other hedging agreements or arrangements, (e) capital leases or finance leases, (f) deferred purchase price of property, assets, business, securities or services (including all deferred purchase price liabilities, earn-outs, seller notes, holdbacks, post-Closing true-up obligations or similar performance payments and any related Taxes including the employer's portion of Social Security Taxes (in each case, at the maximum amount payable thereunder), whether contingent or otherwise), (g) deferred rent (and any obligations which in accordance with GAAP should be recorded as deferred rent), (h) declared or unpaid dividends or distributions, (i) any Liabilities for deferred revenue and (j) guarantees of any Indebtedness of the type described in the foregoing clauses (a) - (i).

(mm)  "Intellectual Property" shall mean, without limitation, all intellectual property rights arising anywhere in the world, whether registered, unregistered, registerable, or unregistrable, and all rights associated therewith such as the right to apply for their registration and bring proceedings for their infringement, including (a) patents, reissues of and, re-examined patents, and patent applications (wherever filed and wherever issued, including continuations, continuations-in-part, substitutes, and divisions of such applications and all priority rights resulting from such applications) now existing and hereafter filed, issued or acquired; (b) rights to inventions, improvements, developments, and ideas (in each case, whether patentable or unpatentable); (c) rights associated with works of authorship, including copyrights, moral rights, copyright applications, copyright registrations, synchronization rights, mask work rights, mask work applications and mask work registrations; (d) trademarks, service marks, trade names, domain names, logos, trade dress, and the applications for registration and the registrations thereof and rights in goodwill; (e) rights in undisclosed or confidential information (such as know-how, trade secrets and inventions (whether patentable or not)), and other similar or equivalent rights or forms of protection (whether registered or unregistered) and (f) other proprietary rights arising under statutory or common law, contract, or otherwise, and whether or not perfected and all applications (or rights to apply) for, and for renewals and extensions of, such rights as may now or in the future exist anywhere in the world, in all media, for all versions and elements, in all languages, and for the entire duration of such rights.

(nn)  "Knowledge of Purchaser", or words of like import, means the actual knowledge, after reasonable inquiry (which in no event encompasses constructive, imputed or similar concepts of knowledge) of Robert Stiles, who shall not, for the sake of clarity and avoidance of doubt, have any personal Liability regarding such knowledge.

(oo)  "Knowledge of Sellers", or words of like import, means the actual knowledge, after reasonable inquiry (which in no event encompasses constructive, imputed or similar concepts of knowledge) of Robert Stiles, Stephen Childress and Earl Ashley,

45

110009169.3

none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability regarding such knowledge.

(pp) "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, ordinance, code, decree, treaty, convention, rule, regulation or Order issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body of competent jurisdiction.

(qq) "Leases" means all unexpired leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which Sellers hold any leasehold or subleasehold estates and other rights in respect of any real property.

(rr) "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, Tax, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ss) "Made Available" means such information or documents have been (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (ii) made available in the Dataroom but only to the extent made accessible therein to Purchaser or its Representatives, in each case at least two (2) Business Days prior to the Closing Date.

(tt) "Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to cause or become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) of the Sustainable Products Group or the Acquired Assets (including the value thereof) and Assumed Liabilities, or (b) the ability of the Sellers to perform their obligations under the Transaction Agreements or consummate the Transactions, *provided* that none of the following (or the consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect under clause (a) of this definition: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions directly or indirectly affecting the oil and gas services industry in which the Sellers operate and in the area in which the Acquired Assets are located, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products or technologies from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in,

46

arising from or relating to national or international political conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak or any quarantine or trade restrictions related thereto; (iv) Effects in, arising from or relating to the decline or rise in price of any currency; (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof from and after the Execution Date; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by any Governmental Body and any increase (or decrease) in the terms or enforcement of any of the foregoing, in each case, from and after the Execution Date; (viii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans; (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transaction or breach by Purchaser of this Agreement; (x) any matter set forth in the Disclosure Schedules; or (xi) (A) the commencement or pendency of the Bankruptcy Cases or any acts, omissions, events or circumstances, directly or indirectly, arising out of or caused by the commencement or pendency thereof; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order or the reorganization or liquidation of the Sellers or their Affiliates or (3) the assumption or rejection of any Assigned Contract or (C) any Order of the Bankruptcy Court or any actions or omissions of the Sellers or their Affiliates in compliance therewith.

(uu)   "Non-Income Taxes" means any Taxes other than Income Taxes, including ad valorem, use, property, excise, sales, severance, production, gross proceeds, conservation, use or other similar Taxes based upon the acquisition, operation or ownership of the Acquired Assets, but excluding, for the avoidance of doubt, Transfer Taxes.

(vv)   "Order" means any order, injunction, judgment, decree, ruling, writ or arbitration award of a Governmental Body of competent jurisdiction, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(ww)   "Ordinary Course" means the ordinary course of business of the Purchaser or Sellers, as applicable, consistent with past practice.

47

110009169.3

(xx)    "Petition Date" means the date that Sellers file voluntary petitions commencing the Bankruptcy Cases, which shall be on or before the later of (a) February 23, 2026 and (b) one (1) Business Day following the date on which the Deposit is paid.

(yy)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet delinquent or being contested in good faith by appropriate proceedings, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens, (iv) licenses granted on a non-exclusive basis, (v) Encumbrances that are Assumed Liabilities and (vi) solely prior to Closing, any Encumbrances that will be removed or released or otherwise rendered ineffective by operation of the Sale Order.

(zz)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(aaa)   "Release" means releasing, disposing, discharging, injecting, spilling, leaking, leaching, dumping, pouring, emitting, escaping, emptying, seeping, placing, migrating and the like into or upon any land or water or air or otherwise entering into the environment.

(bbb)   "Representative" means, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

(ccc)   "Sale Hearing" means a hearing before the Bankruptcy Court at which the Sellers will seek entry of the Sale Order.

(ddd)   "Sale Order" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to Sections 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing the Sellers to consummate the Transactions, in form and substance reasonably acceptable to the Parties.

(eee)   "Seller Benefit Plan" means each Benefit Plan that is sponsored, maintained, administered, or contributed to by any Seller or Subsidiary thereof for the benefit of its current or former directors, officers, employees or individual independent contractors or pursuant to which any Seller or Subsidiary thereof could reasonably be expected to have liability.

(fff)   "Subsidiary" means, of any Person, any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than 50% of the voting power or Equity Interests are owned or controlled directly or

48

indirectly by such Person, or one or more of the Subsidiaries of such Person, or a combination thereof.

(ggg) "Sustainable Products Group" refers to Sellers' assets in development related to sustainable compression technology, methane free seals, carbon capture from exhaust off compression, and other similar technologies.

(hhh) "Tax" or "Taxes" means all federal, state, local and foreign income, profits, franchise, sales, use, ad valorem, property, severance, production, conservation, excise, stamp, documentary, real property transfer or gain, gross receipts, goods and services, registration, capital, transfer or withholding taxes or other governmental fees or charges in the nature of a tax imposed by any taxing authority, including any interest, penalties or additional amounts which may be imposed with respect thereto.

(iii) "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(jjj) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto and any amendments thereof.

(kkk) "Transaction Agreements" means this Agreement, the Escrow Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(lll) "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(mmm) "WARN Act" shall mean the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state and local laws related to plant closings, relocations, mass layoffs and employment losses.

**Section 10.2   Rules of Interpretation.** Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Disclosure Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a) The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, section of the Disclosure Schedules and exhibit references contained in this Agreement are references to sections, clauses, sections of the Disclosure Schedules and exhibits in or to this Agreement, unless otherwise specified. All exhibits and Disclosure Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Disclosure Schedule or exhibits but not otherwise defined therein shall be defined as set forth in this Agreement.

(b) Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where

49

110009169.3

the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c) The words "to the extent" shall mean "the degree by which" and not simply "if."

(d) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e) Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f) The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g) All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(h) Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(i) A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(j) A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(k) Notwithstanding the date any representation and warranty is made in this Agreement, if the accompanying disclosure is expressly made as of a different date as set forth in such disclosure in the Disclosure Schedules, then the representation and warranty shall be made only as of such date in all respects.

*[Signature pages follow.]*

50

110009169.3

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**E4 ENERGY SERVICES, LLC**

By: _____

Name: Robert Stiles

Title:   Manager

[SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT]

110009169.3

**SELLERS:**

**E3 COMPRESSION HOLDINGS LLC**

By: _Ben Chesters_

Name: Ben Chesters

Title: Chief Restructuring Officer

**AXIP ENERGY SERVICES, LP**

By: _Ben Chesters_

Name: Ben Chesters

Title: Chief Restructuring Officer

**AXIP ENERGY SERVICES MANAGEMENT, LLC**

By: _Ben Chesters_

Name: Ben Chesters

Title: Chief Restructuring Officer

**AXIP GAS SOLUTIONS GP, LLC**

By: _Ben Chesters_

Name: Ben Chesters

Title: Chief Restructuring Officer

**AXIP GAS SOLUTIONS PARTNERS, LP**

By: _Ben Chesters_

Name: Ben Chesters

Title: Chief Restructuring Officer

[SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT]

110009169.3

**AXIP MLP HOLDINGS, LLC**

By: _Ben Chesters_

Name: Ben Chesters
Title: Chief Restructuring Officer


**AXIP PRODUCER SERVICES, LLC**

By: _Ben Chesters_

Name: Ben Chesters
Title: Chief Restructuring Officer


**AXIP PRODUCER SERVICES –
MARCELLUS I, LLC**

By: _Ben Chesters_

Name: Ben Chesters
Title: Chief Restructuring Officer


**AXIP HOLDINGS, LLC**

By: _Ben Chesters_

Name: Ben Chesters
Title: Chief Restructuring Officer


**AXIP LEASING COMPANY, LLC**

By: _Ben Chesters_

Name: Ben Chesters
Title: Chief Restructuring Officer


[SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT]

110009169.3

**AXIP LEASING COMPANY II, LLC**

By: _____

Name: Ben Chesters

Title: Chief Restructuring Officer


**AXIP INTERNATIONAL, LLC**

By: _____

Name: Ben Chesters

Title: Chief Restructuring Officer


[SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT]

110009169.3

## Exhibit A

### Bill of Sale

[See Attached.]

110009169.3

## BILL OF SALE

This BILL OF SALE (this "Bill of Sale"), dated as of [●], 2026, is entered into by and between E4 Energy Services, LLC, a Texas limited liability company (the "Purchaser") and E3 Compression Holdings LLC, a Delaware limited liability company ("E3"), Axip Energy Services, LP, a Texas limited partnership, and collectively with its Subsidiaries and Affiliates signatory hereto (the "Sellers", and collectively with Purchaser, the "Parties"), pursuant to that certain Asset Purchase Agreement, dated as of __April 6__, 2026 (the "Purchase Agreement"), by and among the Parties. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Purchase Agreement.

**WHEREAS**, the Parties have entered into the Purchase Agreement pursuant to which Purchaser is (i) acquiring from the applicable Seller the Acquired Assets and (ii) assuming from the applicable Seller the Assumed Liabilities, in each case as set forth therein (collectively, the "Transferred Property"); and

**WHEREAS**, in order to consummate the transfer by the applicable Seller of the Transferred Property, Purchaser and Sellers are executing and delivering this Bill of Sale.

**NOW, THEREFORE,** in consideration of the mutual covenants, terms and conditions set forth in this Bill of Sale, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Conveyance of Acquired Assets. Subject to the terms and conditions of the Purchase Agreement, each Seller hereby transfers, conveys, assigns and delivers to Purchaser all of such Seller's right, title and interest in, to and under the Acquired Assets and Purchaser hereby takes and accepts such transfer, conveyance, assignment and delivery; provided, however, that such Seller does not hereby sell, transfer, convey, assign or deliver to Purchaser any of the Excluded Assets.

2.      Assumption of Assumed Liabilities. Subject to the terms and conditions set forth in the Purchase Agreement, the Purchaser hereby assumes and accepts such conveyance and assumes and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) any and all Assumed Liabilities from the applicable Seller; provided, however, it is expressly understood, and each Seller hereby agrees, that the Purchaser will not assume or have any responsibility whatsoever with respect to the Excluded Liabilities, all of which shall remain the sole responsibility of the applicable Seller.

3.      Purchase Agreement. This Bill of Sale is being executed in accordance with and is subject to all of the representations and warranties, covenants, and other provisions set forth in the Purchase Agreement, all of which are hereby incorporated herein by reference. Notwithstanding any other provision of this Bill of Sale to the contrary, nothing contained herein shall in any way supersede, amend, rescind, waive, expand, or in any other way affect the provisions, including the representations, warranties, covenants and agreements or the rights and remedies of any of the parties under the Purchase Agreement. This Bill of Sale is intended only to effect the transfer of the Transferred Property pursuant to the Purchase Agreement, and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement. In the event of any

1

110009169.3

inconsistency between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and shall supersede this Bill of Sale in all respects.

4.      Further Assurances. At and from time to time following the Closing, Sellers and Purchaser shall take such actions as required by Section 5.5(d) (*Further Assurances*) of the Purchase Agreement in regard to this Bill of Sale, *mutatis mutandis*.

5.      Counterparts. This Bill of Sale, and any amendments hereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

6.      Governing Law. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Bill of Sale and any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Bill of Sale or the negotiation, execution, or performance of this Bill of Sale and any questions concerning the construction, interpretation, validity and enforceability of this Bill of Sale (a "Bill of Sale Dispute") will be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements executed and performed entirely within such State without regard to conflicts of law principles of the State of Texas or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Texas to apply. THE PARTIES HERETO ACKNOWLEDGE AND AGREE THAT ANY BILL OF SALE DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY BILL OF SALE DISPUTE. THE PARTIES HERETO AGREE AND CONSENT THAT ANY SUCH BILL OF SALE DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS BILL OF SALE WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. THE PARTIES (I) CERTIFY THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY BILL OF SALE DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGE THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS BILL OF SALE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6.

7.      Exclusive Jurisdiction. The Parties hereto agree that any Action arising from or relating to this Bill of Sale or the subject matter hereof shall be resolved in accordance with, and

110009169.3

subject to, Section 9.12 (*Jurisdiction and Exclusive Venue*) of the Purchase Agreement, *mutatis mutandis*.

8.      Severability.  Whenever possible, each provision of this Bill of Sale will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Bill of Sale or in any other jurisdiction.

9.      No Third Party Beneficiaries.  Nothing expressed or referred to in this Bill of Sale will be construed to give any Person other than the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Bill of Sale or any provision of this Bill of Sale.

10.     Binding Effect; Assignment.  This Bill of Sale shall be binding on the Parties, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Bill of Sale nor any of the rights or obligations hereunder may be assigned or delegated by Sellers without the prior written consent of Purchaser, and any attempted assignment or delegation without such prior written consent shall be null and void.  Purchaser may, with reasonable notice to Sellers, assign this Bill of Sale and any of Purchaser's rights and obligations hereunder to a controlled Affiliate or other wholly-owned subsidiary of Purchaser, provided that no such assignment shall relieve Purchaser of its obligations under Bill of Sale.

*[Remainder of page left blank intentionally. Signature page follows.]*

3

110009169.3

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Bill of Sale as of the date first written above.

**PURCHASER:**

**E4 ENERGY SERVICES, LLC**

By: _____
Name: _____
Title: _____

**SELLERS:**

**E3 COMPRESSION HOLDINGS LLC**

By: _____
Name: _____
Title: _____

**AXIP ENERGY SERVICES, LP**

By: _____
Name: _____
Title: _____

**AXIP ENERGY SERVICES MANAGEMENT, LLC**

By: _____
Name: _____
Title: _____

*[Signature Page to Bill of Sale]*

110009169.3

**AXIP GAS SOLUTIONS GP, LLC**

By: _____
Name: _____
Title: _____

**AXIP GAS SOLUTIONS PARTNERS, LP**

By: _____
Name: _____
Title: _____

**AXIP MLP HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

**AXIP PRODUCER SERVICES, LLC**

By: _____
Name: _____
Title: _____

**AXIP PRODUCER SERVICES – MARCELLUS I, LLC**

By: _____
Name: _____
Title: _____

*[Signature Page to Bill of Sale]*

110009169.3

**AXIP HOLDINGS, LLC**

By: _____
Name: _____
Title: _____


**AXIP LEASING COMPANY, LLC**

By: _____
Name: _____
Title: _____


**AXIP LEASING COMPANY II, LLC**

By: _____
Name: _____
Title: _____


**AXIP INTERNATIONAL, LLC**

By: _____
Name: _____
Title: _____


*[Signature Page to Bill of Sale]*

110009169.3

## Schedule 1.1(a)

### Assets

1. ### US Patents

| Name of Grantor | Patent | Issue Date | Patent Number |
|---|---|---|---|
| Axip Energy Services, LP | Greenhouse Gas Reduction with Externally Pressurized Gas Seal and Gas Lubrication for a Reciprocating Compressor | 1/28/2025 | 12,209,580 B2 |
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | 04/25/2023 | 11,635,255 B1 |

2. ### Pending US Patent Application

| Name of Grantor | Title | Filed Date | Serial Number | Status |
|---|---|---|---|---|
| Axip Energy Services, LP | Greenhouse Gas Reduction with Externally Pressurized Gas Seal and Gas Lubrication for a Reciprocating Compressor | 12/26/2024 | 19/001,742 | Published |

3. ### Pending Non-US Patent Application

| Name of Grantor | Title | Country | Filed Date | Serial Number | Status |
|---|---|---|---|---|---|
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | WIPO | 3/24/2023 | PCT/US2023/064900 | Expired |
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | Canada | 10/7/2024 | 3,247,830 | Pending |
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | European Patent Office | 10/22/2024 | EP 23 785 530.9 | Pending |
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | Australia | 11/5/2024 | 2023250634 | Pending |
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | India | 11/6/2024 | 202417085148 | Published |
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | Saudi Arabia | 11/12/2024 | 1120246404 | Pending |

*[Signature Page to Assignment and Assumption Agreement]*

110009169.3

| Name of Grantor | Title | Country | Filed Date | Serial Number | Status |
|---|---|---|---|---|---|
| Axip Energy Services, LP | Liquid or Supercritical Carbon Dioxide Capture from Exhaust Gas | China | 12/5/2024 | 202380045216.7 | Published |
| Axip Energy Services, LP | Greenhouse Gas Reduction with Externally Pressurized Gas Seal and Gas Lubrication for a Reciprocating Compressor | WIPO | 1/30/2024 | PCT/US2024/013580 | Published |
| Axip Energy Services, LP | Greenhouse Gas Reduction with Externally Pressurized Gas Seal and Gas Lubrication for a Reciprocating Compressor | Canada | 7/29/2025 | 3,281,448 | Pending |
| Axip Energy Services, LP | Greenhouse Gas Reduction with Externally Pressurized Gas Seal and Gas Lubrication for a Reciprocating Compressor | European Patent Office | 8/24/2025 | 24750878.1 | Published |

4. License Agreement, by and between E3 Energy Services, LLC and David T. Stiles, effective as of September 10, 2022(the "*Stiles License Agreement*").

5. Any and all data, information, knowledge, know-how and other unregistered Intellectual Property, including but not limited to proprietary designs, that is related to, has been used in, or is being developed for use in connection with, in each case, predominately relating to, the Sustainable Products Group.

6. All confidentiality agreements and/or other non-disclosure agreements predominantly related to the Sustainable Products Group.

7. Any and all Personal Property, including prototypes, test equipment, 3D printer, testing projects and other proprietary information, in each case, to the extent predominately related to the Sustainable Products Group.

8. Technology Development Agreement, by and between Axip Energy Services, LP and INNIO Waukesha Gas Engines Inc., effective as of June 26, 2024 (the "*Innio Agreement*").

*[Signature Page to Bill of Sale]*

110009169.3

**Exhibit B**

**Proposed Castex Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-90338 (CML)** |
| | § | |
| **AXIP ENERGY SERVICES, LP,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**ORDER (I) APPROVING SALE OF CASTEX COMPRESSOR**
**FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS,**
**AND ENCUMBRANCES AND (II) GRANTING RELATED RELIEF**

Upon the *Emergency Motion of Debtors for Entry of Orders (A) Approving (I) Bidding Procedures, (II) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (III) Assumption and Assignment Procedures; (B) Designating Stalking Horse Bidder and Authorizing Debtors to Provide Bid Protections; (C) Scheduling Auction, Sale Hearing, and Related Deadlines; (D) Approving (I) Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (II) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (E) Granting Related Relief* [Docket No. 20] (the "***Motion***"),[2] filed by the above-referenced debtors and debtors in possession (collectively, the "***Debtors***") seeking, among other things, entry of an order (the "***Sale Order***") authorizing the sale of substantially all of the Debtors' Assets, including the private sale of the Castex Compressor (the "***Castex Sale***"), free and clear of all Liens, Claims, and Interests (as defined herein) and granting related relief, all as more fully set forth in the Motion; and upon consideration of the *Declaration*

---

[1]   The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are:  Axip Energy Services, LP (9220); Axip Energy Services Management, LLC (9986); Axip Holdings, LLC (6302); Axip Leasing Company, LLC (5678); Axip Producer Services - Marcellus I, LLC (3312); Axip Producer Services, LLC (4792); and E3 Compression Holdings LLC (0825). The location of the Debtors' corporate headquarters is: 1221 McKinney, Suite 3175, Houston, Texas 77010.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or that certain Sale Agreement between Castex Energy, Inc. as purchaser and Axip Energy Services, LP as seller (the "***Sale Agreement***"), attached hereto as **Exhibit 1**, as applicable.

1

4925-0524-3805

*of Ben Chesters in Support of the Castex Sale* [Docket No. 259] and the *Declaration of Robert A. Pacha in Support of Sales* [Docket No. 260] (together, the "***Declarations***"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, dated May 24, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having conducted a hearing on April 6, 2026, (the "***Sale Hearing***") to consider the relief requested in the Motion as set forth in this Sale Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Castex Sale, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and the Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary, it is HEREBY FOUND AND DETERMINED THAT:

A.    **Findings and Conclusions**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

4925-0524-3805

B.    **Jurisdiction**. The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Castex Compressor pursuant to 28 U.S.C. § 1334(e), as this Asset is property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.   This is a core proceeding within the meaning of 28 U.S.C. § 157(b); this Court has the authority to enter a Final Order.

C.    **Venue**. Venue of these Chapter 11 Cases and approval of the Motion and the Sale Transaction is proper in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.    **Basis for Relief**. The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9006, 9007, 9008, 9014, and 9019 of the Bankruptcy Rules, rules 4002-1(e) and 9013-1 of the Local Rules, and the Complex Case Procedures. The consummation of the transaction contemplated by the Sale Agreement and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures and the Debtors and the Buyer have complied with all of the applicable requirements of such sections and rules with respect to such transaction.

E.    **Final Order; Immediate Effect**. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, and notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and

3

authorizes the prompt consummation of the Castex Sale without regard to any stay or delay in its implementation.

F.     **Notice and Opportunity to Object**. Notice of the Motion, the Sale Hearing, the Castex Sale, and the deadlines related thereto was provided to: (a) the U.S. Trustee; (b) counsel to the DIP Agent, the Prepetition Superpriority Agent, and the Prepetition ABL Agent; (c) counsel to the Prepetition 2L Agent; (d) counsel to the Committee; (e) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (f) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (g) the Internal Revenue Service; and (h) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules. *See Certificate of Service* [Docket No. 173]. The Debtors published such Sale Notice in the *Wall Street Journal*. *See Affidavit Re: Publication of Notice of Sale, Bidding Procedures, Auction and Sale Hearing* [Docket No. 143]. Additionally, the Debtors posted the Sale Notice to the Debtors' case information website located at https://dm.epiq11.com/AXIP.

G.     **Sufficient Notice**. The notice provided by service of the Motion and publication of the Sale Notice as described in paragraph F was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Sale Hearing, the Castex Sale, and the deadline to submit any objection to the Castex Sale is or shall be required.

H.     **Asset Property of the Estate**. The Castex Compressor sought to be sold and assigned by the Debtors to the Buyer pursuant to the Sale Agreement are property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is vested in the Debtors' estates.

4

4925-0524-3805

I. **Sufficiency of Marketing**.  As set forth in the Motion and the Declarations, the Debtors and their professionals adequately marketed the Castex Compressor in connection with a robust, fair, and open sale process for all of the Debtors' Assets.  The sale process was non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity to any entity to make an offer to purchase the Castex Compressor, among other of the Debtors' Assets.  The marketing process undertaken by the Debtors and their professionals with respect to the Castex Compressor has been adequate, appropriate, and reasonably calculated to maximize value for the benefit of the Debtors' estates and all stakeholders.

J. **Highest or Otherwise Best Offer**.  The Debtors determined, in a valid and sound exercise of their business judgment and after a robust and extensive marketing process, that the transaction contemplated by the Sale Agreement represents the highest or otherwise best offer for the Castex Compressor.  The Debtors have demonstrated that consummating the transaction consummated by the Sale Agreement presents the best opportunity to maximize the value of the Castex Compressor and entry into the Sale Agreement is a sound exercise of the Debtors' business judgment.

K. **Buyer**.  On the terms and subject to the conditions contained in the Sale Agreement, the Buyer agreed to provide a cash payment of $160,089.00 as aggregate consideration for the Castex Compressor (the "***Purchase Price***").

L. **Business Justification; Fiduciary Duties**. The Debtors have demonstrated that entry into and consummation of the Sale Agreement constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  The Debtors have demonstrated compelling circumstances for the Castex Sale outside (i) the ordinary course of business, pursuant to section

4925-0524-3805

363(b) of the Bankruptcy Code and (ii) a plan of reorganization or liquidation (as the case may be), in that, among other things, the immediate consummation of the Castex Sale is necessary and appropriate to preserve and to maximize the value of the Debtors' estates.  This Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Castex Compressor to the Buyer pursuant to the terms and conditions set forth in the Sale Agreement.

M.     The Debtors' decision to enter into the Sale Agreement and consummate the Castex Sale constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, officers, and managers.  Because the entry into and consummation of the Sale Agreement constitutes the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents shall have or incur no liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the Sale Agreement or the consummation of the Castex Sale contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the Sale Agreement, willful misconduct, or fraud, in each case as determined by a court of competent jurisdiction.

N.     **Corporate Authority**. The Debtors (i) have full corporate power and authority to execute the Sale Agreement and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Castex Sale, and (iii) have taken all corporate action necessary to authorize and approve the Sale Agreement and any actions required to be performed by the Debtors to consummate the Castex Sale.  No further consents or approvals of the Debtors are required for the Debtors to consummate the Castex Sale.

6

O.    **Arm's-Length Sale and Buyer's Good Faith**. The Sale Agreement was negotiated and is undertaken by the Debtors and Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.

P.    **No Fraudulent Transfer**. The total consideration provided by the Buyer pursuant to the Sale Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, or possession thereof, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The Sale Agreement was not entered into, and the Castex Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer has entered into the Sale Agreement or is consummating the Castex Sale with any fraudulent or otherwise improper purpose.

Q.    **Free and Clear Transfer Required by Buyer**. If the Debtors did not sell the Castex Compressor free and clear of all Liens, Claims, and Interests, to the extent allowable under section 365(f) of the Bankruptcy Code, the Buyer would not have entered into the Sale Agreement and would not consummate the Castex Sale, thus adversely affecting the Debtors, their estates, their creditors, and holders of their equity interests. Therefore, the Castex Sale contemplated by the Sale Agreement free and clear of all Liens, Claims, and Interests is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

R.    As of the Effective Date, pursuant and subject to the terms of the Sale Agreement and this Sale Order, the transfer of the Castex Compressor and the consummation of

7

4925-0524-3805

the Castex Sale will effect a legal, valid, enforceable, and effective transfer of the Castex Compressor and will vest the Buyer with the Debtors' right, title, and interest in the Castex Compressor free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever.

S.     **Satisfaction of Bankruptcy Code Requirements**.  The consummation of the Castex Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a) and 363 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Castex Sale contemplated hereby.

T.     **Satisfaction of Section 363(f) Standards**. The Debtors are authorized to sell the Castex Compressor free and clear of all Liens, Claims, and Interests because, with respect to each creditor or other person or entity asserting a Lien, Claim, or Interest, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each creditor or other person or entity asserting a Lien, Claim, or Interest in the Castex Compressor (i) has, subject to the terms and conditions of this Sale Order, consented to the Castex Sale or is deemed to have consented to the Castex Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, or Interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Liens, Claims, and Interests who did not object (or who ultimately withdrew their objections, if any) to the Castex Sale or the Motion are deemed to have consented to the Motion and Castex Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  Creditors or other persons or entities asserting a Lien, Claim, or Interest in or against the Castex Compressor could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, or Interest.  Those holders of Liens, Claims, and Interests who did object fall within one or more of the other subsections of section 363(f) of the

8

4925-0524-3805

Bankruptcy Code by having their Liens, Claims, and Interests, if any, in each instance against the Debtors, their estates, or the Castex Compressor, attach to the Proceeds of the Castex Sale ultimately attributable to the Castex Compressor in which such holder alleges Liens, Claims, and Interests.

U.      **Sale as Exercise of Business Judgment**. Entry into and consummation of the Sale Agreement constitutes the exercise by the Debtors of sound business judgment, and such act is in the best interests of the Debtors, their estates and creditors, and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Castex Compressor to the Buyer.  Additionally: (i) there is risk of deterioration of the value of the Castex Compressor if the Castex Sale is not consummated promptly; and (ii) the Sale Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the sale prior to, and outside of, a chapter 11 plan.

V.      **No Sub Rosa Plan**. The Sale Agreement and the Castex Sale do not constitute a *sub rosa* chapter 11 plan.  The Sale Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

W.      **DIP Obligations**.  On February 25, 2026, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket. No. 83] (the "***Interim DIP Order***" and the order granting such relief on a final basis [Docket No. 178], the "***Final DIP***

*Order*" and, together with the Interim DIP Order, the "***DIP Orders***").  Pursuant to the DIP Orders, the Castex Compressor, constitutes DIP Collateral and is subject to the DIP Liens, the Adequate Protection Liens, and the Prepetition Secured Liens (in each case, as such terms are defined in the DIP Orders).  The use of the proceeds from the sale of the Castex Compressor shall comply in all respects with the requirements of the DIP Orders and the DIP Documents and is supported by good, sufficient, and sound business reasons.

X.      **Time of the Essence; Waiver of Stay.**  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Castex Sale must be approved and consummated promptly to preserve and maximize the value of the Castex Compressor.  Time, therefore, is of the essence in effectuating the Sale Agreement.  As such, the Debtors and the Buyer intend to consummate the sale of the Castex Compressor, will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in doing so, and may consummate the Castex Sale at any time after the entry of this Sale Order subject to the terms and conditions of the Sale Agreement. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Agreement.  Accordingly, cause has been shown as to why this Sale Order should not be subject to any stay, including, without limitation, as provided by Bankruptcy Rules 6004(h), 6006(d), and any applicable Local Bankruptcy Rule.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.      **Approval of Sale Agreement**. The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Sale Agreement attached hereto as **Exhibit 1** and the consummation of the transaction contemplated thereby is authorized and approved.

10

4925-0524-3805

2.     **Objections Overruled**. Any objections and responses to the Motion or the relief requested therein that relate to the Castex Sale and that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.     **Approval of Castex Sale**. Pursuant to sections 105, 363, and any other applicable provision of the Bankruptcy Code, the Sale Agreement is hereby approved as set forth herein and the Debtors are authorized to take any and all actions necessary to consummate the Castex Sale. The Debtor has satisfied all requirements of §§ 363(b) and 363(f) of the Bankruptcy Code and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of all Liens, Claims, and Interests (as defined herein).

4.     **Sale and Transfer Free and Clear**. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtors shall transfer to the Buyer, upon the Effective Date, the Debtors' right, title, and interest in and to, and possession of, the Castex Compressor, which shall be immediately vested in Buyer, and such title to the Castex Compressor shall be transferred to Buyer shall be free and clear of all Liens, Claims, and Interests including, without limitation:

(a)     any and all charges, liens (statutory or otherwise), claims, mortgages, hypothecations, deeds of trust, pledges, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of setoff, successor liability, easements, servitudes, restrictive covenants, interests or rights under any operating agreement, encroachments, encumbrances, third-party interests, or any other restrictions or limitations of any kind with respect to the Castex Compressor;

(b)     any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under (x) any labor, employment, or pension laws, (y) health or welfare, compensation or other employee plan, agreements, practices, and programs (including any Employee Benefit Plan) of or related to any of the Debtors

11

or any Debtor's affiliates or predecessors or any current or former employees of any of the forgoing, or (z) any workers' compensation, occupational disease, or unemployment or temporary disability related law, (ii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, and (iii) any and all other claims, causes of action, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third-party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, managers, agents, or successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and bidding process with respect to the Castex Compressor or the transaction contemplated by the Sale Agreement; and

(c)     any and all equity or other interests of any kind or nature whatsoever in or with respect to (i) any of the Debtors or their respective affiliates, subsidiaries, or successors or assigns or (ii) the Castex Compressor.

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Effective Date (collectively, the "***Liens, Claims, and Interests***"). Any and all such Liens, Claims, and Interests shall attach to the Proceeds.

5.      **Binding Effect of Order**. This Sale Order and the Sale Agreement shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens, Claims, and Interests in, against, or on the Castex Compressor (whether known or unknown), the Buyer and all successors and assigns of the Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these Chapter 11 Cases or upon

12

4925-0524-3805

a conversion to case under chapter 7 of the Bankruptcy Code, and the Sale Agreement shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to the Buyer hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  The Sale Agreement, this Sale Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Buyer.  To the extent of any conflict between this Sale Order or the Sale Agreement and such future plan or order, the terms of this Sale Order and the Sale Agreement shall control.

6. **No Material Modifications**. The Sale Agreement and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

7. **Valid Transfer**. Effective upon the Effective Date, the transfer to the Buyer of the Debtors' right, title, and interest in the Castex Compressor pursuant to the Sale Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title, and interest in the Castex Compressor, and vests with or will vest in the Buyer all right, title, and interest of the Debtors in the Castex Compressor, free and clear of all Liens, Claims, and Interests.

8. **Fair Consideration**.  The consideration provided by the Buyer for the Castex Compressor under the Sale Agreement shall be deemed to constitute reasonably equivalent value

13

4925-0524-3805

and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, or possession thereof, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The Sale Agreement was not entered into, and the Castex Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or any other applicable law. Neither the Debtors nor the Buyer have entered into the Sale Agreement or are consummating the Castex Sale with any fraudulent or otherwise improper purpose.

9.      The Sale Agreement and the transaction contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. None of the Debtors, the Buyer, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the Sale Agreement or the consummation of the transaction contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

10.     **Good Faith Purchaser**. The Castex Sale contemplated by the Sale Agreement is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion in undertaking the Castex Sale contemplated by the Sale Agreement. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Castex Sale shall not affect the validity of the sale of the Castex Compressor to the Buyer unless such authorization is duly stayed pending such appeal. The Buyer

14

4925-0524-3805

is a good faith purchaser of the Castex Compressor and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

11.     **Release of Liens, Claims, and Interests**. Effective upon the Effective Date, this Sale Order: (a) is and shall be effective as a determination that all Liens, Claims, and Interests of any kind or nature whatsoever existing as to the Castex Compressor prior to the Effective Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; (b) is and shall be binding upon and shall govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Castex Compressor; (c) and all recorded Liens, Claims, and Interests against the Castex Compressor shall be deemed stricken from such persons' and entities' records, official and otherwise.

12.     **Approval to Release Interests**. If any person or entity that has filed financing statements, mortgages, mechanic's liens or other documents or agreements evidencing Liens, Claims, or Interests in or against the Castex Compressor shall not have delivered to the Debtors before the Effective Date, in proper form for filing and executed by the appropriate parties, the appropriate documentation with respect to the release of such Liens, Claims, or Interests, the Buyer is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity.  On the Effective Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably

15

requested by the Buyer, in each case, at the Seller's sole expense, to release its Liens, Claims or other Interests against the Castex Compressor, if any. The Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, or Interests against the Castex Compressor.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

13.     **Transfer of Marketable Title**. As of the Effective Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtors' right, title and interest in the Castex Compressor and/or a bill of sale transferring good and marketable title in the Castex Compressor to the Buyer pursuant to the terms of the Sale Agreement, free and clear of all Liens, Claims, and Interests.

14.     **Retention of Jurisdiction**. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Sale Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Sale Order (including the exculpation, release and injunctive provisions in this Sale Order) and the terms of the Sale Agreement, all amendments thereto and any waivers and consents thereunder; (ii) protect the Buyer, or the Castex Compressor, from and against any Liens, Claims, and Interests; (iii) compel delivery of the Castex Compressor to the Buyer; (iv) compel the Debtors and the Buyer to perform all of their respective obligations under the Sale Agreement; and (v) resolve any disputes arising under or related to the Sale Agreement or the Castex Sale.

15.     **Automatic Stay**. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

16

4925-0524-3805

16.     **Immediate Effect**. Notwithstanding any provision of the Bankruptcy Rules, including Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in consummating the Castex Sale, and the Debtors and the Buyer are free to consummate the Castex Sale under the Sale Agreement at any time pursuant to the terms thereof and take any other action or perform any act authorized by this Sale Order.

17.     **Failure to Specify Provisions**. The failure to specifically reference any particular provisions of the Sale Agreement or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Sale Agreement and other related documents be authorized and approved in their entirety.

18.     **Provisions Non-Severable**. The provisions of this Sale Order are non-severable and mutually dependent.

Dated: _____, 2026
Houston, Texas

THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

17

4925-0524-3805

**Exhibit 1**

**Sale Agreement**

**Sale Agreement**

This Sale Agreement (this "Agreement"), effective as of April [•], 2026 (the "Effective Date"), is by and between Axip Energy Services, LP, a Texas limited partnership ("Seller") and Castex Energy, Inc. ("Buyer"). Seller and Buyer are referred to collectively herein as the "Parties" and individually as a "Party."

Pursuant to terms of this Agreement, Seller desires to sell, transfer, assign, grant and convey to Buyer, and Buyer desires to accept, the Assets (as hereinafter defined) for $136,000, inclusive of sales taxes (the "Purchase Price").  The Parties agree as follows:

AGREEMENT

1.   Sale.

a)   Seller agrees to sell, transfer, assign, grant and convey to Buyer, subject to the terms and conditions provided in this Agreement, all of Seller's rights, title and interests in and to the assets described on Exhibit A (the "Assets").   The Assets are presently located at the corresponding location identified in Exhibit A (the "Current Location"). Delivery of the Assets shall be "AS IS, WHERE IS" and shall occur EXW the Current Location Incoterms® 2020. Title to the Assets shall transfer to Buyer on funding by Buyer of the amounts provided in Section 2.

b)   **DISCLAIMER OF WARRANTIES AND REPRESENTATIONS. THE ASSETS ARE TRANSFERRED AND SOLD BY SELLER TO BUYER, AND ARE ACCEPTED BY BUYER, "AS IS, WHERE IS" AND WITH ALL OF THEIR FAULTS AND DEFECTS KNOWN AND UNKNOWN, APPARENT AND NON-APPARENT. BUYER EXPRESSLY WAIVES ANY WARRANTY OF FITNESS AND ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED, UNDER APPLICABLE STATE OR FEDERAL LAW, AND THE JURISPRUDENCE THEREUNDER. BUYER EXPRESSLY ACKNOWLEDGES ALL SUCH WAIVERS AND ITS EXERCISE OF BUYER'S RIGHT TO WAIVE WARRANTY. BUYER ACKNOWLEDGES AND AGREES TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND THAT THE DISCLAIMERS IN THIS SECTION 1(b) ARE "CONSPICUOUS."**

c)   Buyer represents that it has had an adequate opportunity to review the DISCLAIMER OF WARRANTIES AND REPRESENTATIONS in Section 1(b), including the opportunity to submit the same to legal counsel for review and comment, and understands the representations and warranties being disclaimed by Seller.

d)   Buyer expressly acknowledges that Seller has provided Buyer with an opportunity to inspect the Assets for all purposes and Buyer has satisfied itself as to the physical and environmental condition of the Assets.

2. Payment of Purchase Price. On the Effective Date, Buyer shall pay Seller (a) the full amount of the Purchase Price and (b) the aggregate amount due under the outstanding invoices identified on the attached Exhibit B.

3. Representations and Warranties.
   a.   Each Party represents and warrants that it has all requisite authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by each Party and constitutes a valid and legally binding obligation of each Party, enforceable in accordance with its terms.

   b.   Seller represents and warrants that it has good title to the Assets, and transfers title to the Assets free of all such liens, claims and encumbrances.

4.   Transfer Taxes. The Purchase Price is inclusive of sales taxes (if any) payable by virtue of the sale of the Assets under this Agreement, and Seller will remit such sales taxes.

5.   Further Assurances. The Parties agree that from and after the date of this Agreement, each of them will execute and deliver such further instruments of transfer and take such other action as may reasonably be requested by any Party to carry out the purposes and intents of this Agreement.

**(Execution Version)**

6. <u>Termination of Existing Services Contract</u>.  Seller and Buyer are parties to that certain Schedule B Services Contract (C4C Quote: Q10104) effective November 20, 2024 (the "Existing Services Contract"). The Existing Services Contract is hereby terminated as of the Effective Date.

7. <u>Counterparts</u>. This Agreement may be executed in counterparts (including counterparts sent by facsimile or pdf formatted counterparts sent by electronic mail).  All counterparts shall be construed together and shall constitute a single instrument.

8. <u>Parties Bound</u>. This Agreement, and all terms and conditions hereof, will bind and inure to the benefit of each of the Parties and their respective successors, assigns, lessees and subleases. No Party will assign, sublease, cede, transfer or encumber this Agreement, or any part thereof or any rights therein, without the prior written consent of the other Party.

9. <u>Governing Law</u>. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

10. <u>Severability</u>. If any provision of this Agreement is held to be unenforceable, this Agreement will be considered divisible and such provision will be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement will remain in full force and effect; provided, however, that if any such provision may be made enforceable by limitation thereof, then such provision will be deemed to be so limited and will be enforceable to the maximum extent permitted by applicable law.

11. <u>Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The word "including" will mean including without limitation. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, will include all other genders; the singular will include the plural, and vice versa. All references herein to exhibits, schedules, articles, sections or subdivisions thereof will refer to the corresponding exhibits, schedules, article, section or subdivision thereof of this Agreement unless specific reference is made to such exhibits, articles, sections or subdivisions of another document or instrument. The terms "herein," "hereby," "hereunder," "hereof," "hereinafter," and other equivalent words refer to this Agreement in its entirety and not solely to the particular portion of the Agreement in which such word is used. Any reference in this Agreement to a Party will also include such Party's permitted successors and assigns.

**(Execution Version)**

IN WITNESS WHEREOF, this Agreement is executed by the Parties as of the Effective Date.

**SELLER:**

**Axip Energy Services, LP**

By: _____
Name: _____
Title: _____

**BUYER:**

**Castex Energy, Inc.**

By: _____
Name: _____
Title: _____

**(Execution Version)**

**Exhibit A**

**Assets**

| Quantity | Equipment Description | Current Location |
|---|---|---|
| 1 | Axip Unit # A7252:<br>11329 - COMPRESSOR PACKAGE:CATERPILLAR_G3406TA,255_CHP,ARIEL_JGA4,3-STAGE,CYL:7.5,5.125,7.5,3.375 | Oyster Bayou Production Barge (Four League Bay, Terrebone Parish, LA) |

**(Execution Version)**

**Exhibit B**

**Outstanding Invoices**

| Invoice # | Invoice Date | Amount Outstanding |
|---|---|---|
| 2700007073 | 9/2/25 | $12,044.50 |
| 2700008217 | 10/1/25 | $12,044.50 |
|  | Total | $24,089.00 |